260 Wis. 541 (1952)
SCHULZ, Respondent,
vs.
CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellant.[*]
Supreme Court of Wisconsin.
January 7, 1952.
February 5, 1952.
*544 For the appellant there were briefs by Bender, Trump, McIntyre, Trimborn & Godfrey, attorneys, and Rodger S. Trump of counsel, all of Milwaukee, and oral argument by Rodger S. Trump.
For the respondent there was a brief by Curran & Curran of Mauston, and oral argument by Charles P. Curran and Thomas J. Curran.
BROWN, J.
Sec. 192.29 (5), Stats., directs the warning which must be placed at every railway-highway crossing.
"Danger Signs. Every railroad corporation shall maintain wherever its track crosses a public highway or street and near such crossing a large signboard with the following inscription, painted in large letters on each side: `Look Out For Cars,' in such manner as to be visible on the highway or street at least a hundred feet distant on each side of such crossing, except that after May 1, 1935, any such signs repainted, replaced, or newly erected shall bear the inscription `Railroad Crossing' instead of the inscription `Look Out For Cars.'"
Photographs of the scene of the accident establish as a matter of law that this statutory duty was performed by the erection of the customary crossbucks bearing the words "Railroad Crossing." The jury could not have found that the railroad's warning to the public of the existence of this crossing was inadequate because of failure to comply with the statute.
The learned trial court charged the jury:
"In addition to the requirements made by statute for every railroad crossing, the railroad company may be required in the exercise of due care to take additional precautions or erect and maintain more adequate warning signs or devices at crossings over a public highway, which crossing is unusually dangerous.
"It is the duty of every railroad corporation to provide a reasonably adequate warning of a crossing to the users of the highway under conditions as they normally exist.
*545 "Before you can answer question 1 `Yes' you must be satisfied by a clear preponderance of the credible evidence that the crossing in question under the general or customary conditions constituted or created an extraordinary hazard, or that it was an unusually dangerous crossing and that such fact was known or in the exercise of ordinary care should have been known to the railroad corporation and that it should have foreseen the danger resulting thereby to users of the highway."
The railroad submits that its duty in respect to warning devices is to follow the statute and the orders, if any, of the public service commission and having here obeyed the statute and not having received any order from the commission it has performed its whole duty in this respect. We concede that if the commission has directed a crossing to be guarded in a particular manner and the railroad has done as directed, it is not required to go further to satisfy a jury's idea of adequate protection. In our present case the commission had not taken notice of this crossing. By giving the commission jurisdiction over the field the legislature did not abolish the common-law duty of the railroad to take such additional precautions as the exercise of due care required until such time as the commission might exercise its jurisdiction over a particular crossing. With this reservation in favor of the exclusive jurisdiction of the public service commission over crossings when the commission has asserted jurisdiction, and with another exception to be mentioned, we consider the learned trial court's instruction correctly states the law. Nevertheless, the instruction should not have been given, nor should the question to which it refers have been submitted to the jury, because it was inappropriate to the matter before the court.
Under normal conditions in the exercise of due care as to lookout, Mr. Schulz would be bound to observe the railroad crossing when he passed over it if not sooner, and having crossed the tracks he could not without negligence *546 in respect to management and control stop his automobile and back onto them in the face of the approaching train. It was necessary for the plaintiff to excuse these prima facie derelictions and she did this to the satisfaction of the jury by the evidence of numerous witnesses concerning the severity of the storm. They were unanimous in testifying that visibility was much impaired. Among the witnesses who came to the scene in automobiles within a short time after the collision was Dr. Meyer. He attempted to drive to the home of one of the injured men to notify the man's wife but "the visibility and the road was so bad we had to turn back." Mr. Clark, the sheriff, testified: "The weather conditions as they existed at that time, it was snowing and blowing severely and it was a very hazardous night to drive. When I arrived at this scene the tracks, the railroad tracks which crossed Highway 21, were covered with snow. In fact there was so much snow and it was rough enough driving slow that I couldn't tell when I crossed the tracks. I did not see any signs or signals or warning of any kind at the track that evening. . . . We had to drive on the low beam and the snow was falling and blowing so densely I didn't see any. . . . It was difficult to see this particular night solely because of the very heavy snow storm. That was the main hazard." Mr. Crandall, driver of the ambulance, testified: "As I remember it, it was snowing and blowing terrifically hard. I doubt very much if I could see much farther than fifty feet. That would be with my headlights on, headlights on low beam. I drove with them on low beam that night, you had to in order to see." Crandall, too, crossed the tracks without knowing it. Mr. Mucha, who rode in the front seat of the Schulz car, testified that Schulz drove to the crossing at a speed of only five or six miles per hour and used the low beam of his headlights. Mucha was looking for the crossing but was unable to see it. *547 When Schulz stopped, Mucha opened the door of the car in order to see better but was unable to advise Schulz because he could not tell where they were. Sec. 85.06 (3), Stats., requires automobiles to have headlights sufficient to disclose substantial objects two hundred feet in front of them. Aside from statute, due care on the part of the automobilist also requires him to have headlights which enable him to see the usual highway directional and warning signs, and the railroad-crossing signs prescribed by statute, located at the sides of highways. There is testimony in the record that the railroad's crossbuck signs were weather-beaten and the paint was coming off. Exhibit 1 of the record is a photograph six and one-half by four and one-half inches, taken December 9, 1950, at 2 :33 p. m., showing the scene of the collision. The camera is fifty paces, approximately one hundred twenty-five feet, west of the west rail of the track, and faces east along the highway in the direction in which Schulz was driving. The day was dull, as shown by the absence of shadows. The signs had not been altered. Without magnification the words "Railroad Crossing" can be read on the crossbuck which is on the near side of the track and the right side of the highway as Schulz came toward it, and the diagonal black and white stripes on the post supporting the crossbuck stand out clearly. These are physical facts which the jury was not at liberty to disregard in favor of testimony that the paint was off and the boards were weathered. There was some evidence that the sign on the west side of the tracks did not give timely warning because the road sloped down to the tracks and as an automobile approached its lights did not illuminate the sign at a sufficient distance. On the night of December 7th, Schulz approached the sign at a speed of five or six miles per hour. He drove with a low-beam headlight, as did the other drivers who testified, in order to see at all, and his range of *548 vision was some fifty feet. His seatmate kept a vigilant lookout, yet neither Mr. Schulz nor Mr. Mucha saw either of the railroad signs though they were within a few feet of them and neither sight nor feeling told them when they passed over the tracks. It was indeed a wild night when signs of the daytime appearance of these, located as they were, remained invisible. Because the instruction and the question were based upon signs adequate to warn the public approaching them at usual speeds and in conditions of normal visibility they were inappropriate and erroneous when applied to the circumstances of this accident.
At crossings where the view is obstructed or diverted so that although the traveler knows the crossing is there he is apt not to discover the approach of a train in time to avoid going on the tracks in front of it, some other device, usually a light or a bell or a moving signal, may be required; but such things are to herald the approach of a train which otherwise might remain unknown to the traveler until it was too late for him to save himself. Their purpose is not to show more clearly than the statutory sign where the tracks are located nor to replace it under conditions of bad visibility; otherwise it would be a breach of the railroad's duty not to have them at all crossings for use when fog or storm interfere with vision. Neither courts, public service commission, nor statutes have imposed that burden on railroads and we conclude that such devices are not required for the purpose of showing the location of tracks, distinct from giving warning of the approach of a train. It is, of course, evident that Schulz, while stopped in a place of safety, knew that a train was coming and besides, the jury found that the railroad was not negligent in warning of its approach.
We conclude, then, that the storm which serves to excuse Mr. Schulz from what would otherwise be negligence in lookout and in management and control must also, as a *549 matter of law, excuse the railroad because its signs were not seen. Whether some other sign sufficient for normal conditions would have been more efficient under these circumstances in disclosing the location of the tracks and in keeping Mr. Schulz off of them is a matter of speculation.
The jury's answers that the railroad was negligent in the matter of giving warning of the crossing to the public, in so far as this applies to Schulz, and that this was a cause of the accident are without support in the evidence.
The jury found that the railroad was operating its train at a speed which was negligent under the circumstances and this negligence was a cause of the accident. There is no statutory speed limit at the scene of this accident. The railroad's own rule was for a speed not in excess of thirty-five miles per hour at that place. The trainmen testified its speed at the time of the collision was under thirty miles per hour and a record made by a mechanical device, which the railroad record keeper testified showed the speed of this train at this time, corroborated their testimony. One of the plaintiff's witnesses saw the collision from the Necedah depot, approximately one hundred eighty feet south of the crossing. His testimony was: "I imagine it [the train] was going about forty miles an hour." He also testified that he heard one of the trainmen say to the engineer that the train was going too fast for the weather conditions. The evidence of negligence in respect to the speed of the train is certainly very weak and it may be doubted whether it affords support to the finding of negligence. However that may be, the question of causation remains and we find no evidence upon which to sustain the finding that the actual speed was a cause of the accident. The jury did not find how fast the train was running nor what would have been a safe speed and the record tells us no more than that a witness "imagined" it may have been going forty miles per hour. It seems to us *550 to be purely speculative to conclude that a speed enough slower to be nonnegligent would have made any difference. Schulz was lost. How long it would take for him to locate tracks which lay somewhere under the snow and see to it that he was not on them is a matter of conjecture. Obviously, he thought his car, when stopped, was on the track. If so, backing some thirty feet would in his estimation make him safe. Actually that distance took him to the real place of danger. After backing that far would he believe himself safe and stop or would he continue to back, still ignorant of where the tracks might be and would he do all this, under the circumstances, so quickly that a train moving at a nonnegligent reasonable speed would not reach the crossing while he was on it? Under the circumstances, Schulz' conduct is completely unpredictable and in such circumstances the finding that the speed of the train was a proximate cause of the accident rests on conjecture.
In its instruction already quoted, the learned trial court charged that the plaintiff must show certain facts "by a clear preponderance of the credible evidence." This quantum of proof was unduly favorable to the defendant. See Bengston v. Estes, post, p. 595, 51 N. W. (2d) 539. Since the answer was favorable to the plaintiff no prejudice resulted from the language used but the instruction is defective in that respect.
By the Court.Judgment reversed and cause remanded with instructions to dismiss the complaint.
NOTES
[*] Motion for rehearing denied, with $25 costs, on April 8, 1952.