53 Wis.2d 12 (1971)
192 N.W.2d 97
KURZ, by Guardian ad litem, and another, Respondents,
v.
CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellant.
No. 144.
Supreme Court of Wisconsin.
Argued November 1, 1971.
Decided November 30, 1971.
*14 For the appellant there was a brief by Godfrey, Trump & Davidson, attorneys, and Rodger S. Trump of counsel, all of Milwaukee, and oral argument by Rodger S. Trump.
For the respondents there was a brief by Kersten & McKinnon, attorneys, and Arlo McKinnon of counsel, all of Milwaukee, and oral argument by Arlo McKinnon.
HALLOWS, C. J.
The first issue is whether there was sufficient credible evidence to support the jury's finding the railroad was negligent. We shall first consider the evidence in respect to the operation and maintenance of the crossing signals. Bluemound Road at the time of the accident was the main arterial going west out of downtown Milwaukee. At the location of the railroad crossing it is a four-lane highway, two westbound lanes and two eastbound lanes, separated by a median strip of some 51 feet. There are two flashing-light signals for the eastbound traffic and two for the westbound traffic, but none of the signals have duplex or back-to-back lights. For the westbound traffic, one signal is to the north of the paved portion of the highway and the other is on the *15 median strip. Both signals had two lights which flash when activated.
Kurz was seventeen years old at the time of the accident and was proceeding west on Bluemound Road about 8:20 in the morning, driving a 1957 Chevrolet; he was familiar with the crossing. The freight train was a mile long, weighed some five thousand tons and was moving in a southeasterly direction on the single track which crossed Bluemound at an angle which measured in the northeast quadrant 140 degrees 10 minutes. About 500 feet from the crossing, Kurz moved to the lane next to the median strip. The traffic in the outer lane was heavy and traveling about 45 miles per hour. There was a car about 250 feet ahead of Kurz in his lane moving about his speed of 45 miles per hour. There was a car following Kurz in his lane. When Kurz was about 150 feet from the crossing, he noticed two cars ahead in the outer lane stopping; he then saw the train about 25 feet north of the crossing and the signal light on the median strip flashing. The car ahead of him had proceeded across the track but Kurz hit his brakes when about 100 feet from the track and when he realized he was not going to be able to stop before reaching the track, he swerved to the right to avoid the train. In this he was unsuccessful and his car was struck on the left side, was thrown into the air, and then struck the left front of the car stopped about 30 feet behind him. Kurz' car then bounced back and struck the crossing signal on the median and came to a rest on top of it.
The railroad argues all the witnesses to the accident saw one or more signals operating at the crossing for a varying period of time and the difference in their testimony was partly due to faulty powers of observation and to trick memories, since the trial was not had for almost seven years after the accident. But more importantly, the railroad argues the signals had to be working and working *16 long enough to give a twenty-four second warning which is sufficient for a car on a highway to safely stop and therefore the railroad was not negligent. This argument is based upon the testimony of experts that the flashing signals at the crossing worked upon a short-circuit principle and are activated by electricity when a train reaches a certain contact or insulated point located 911 feet north of the crossing and are designed to continue flashing until the train which activated the signal has cleared the crossing and reached another insulated point where the circuit ends.
Contrary to this testimony, numerous witnesses who were approaching the crossing at the time the accident happened testified the lights did not flash until the train almost reached the crossing. Roman Bieniewski testified neither the median lights nor the lights on the north shoulder were operating when the train was 100 feet away from the road. Albert Krause said neither signal was working when the train was 25 feet north of the road. Father Linus L. Schmelzer testified the signals were not operating when the train was 35 to 50 feet from the road. Frank Fetzer, Sr., and Frank Fetzer, Jr., both observed the signals when they began to operate; Frank, Sr., stating they began to work when the train was 20 to 30 feet from the road and Frank, Jr., testifying the train was 25 feet away when the signals started to flash. Richard Kurz stated that the median signal was not working when he was 200 feet from the track and the first time he saw any signals working was when he was 100 feet from the track and the train was 20 to 25 feet north of the road. Mrs. Lois Pyne, proceeding east on Bluemound Road, testified for the railroad that the signals facing west were operating when she saw the train approaching the crossing about one or one and one-half blocks away to the north.
This conflicting testimony presented a jury question; we cannot hold that mechanical, automatic devices as a *17 matter of law which may possibly work imperfectly have such great credibility for perfect performance that such evidence must be accepted over human observation to the contrary. True, human observation may be faulty and memories may become dim with lapse of time, but certitude in such cases does not necessarily rest upon a metaphysical or even a physical certitude. The conflict was such that it was for the jury to determine where the truth lay on the basis of probabilities. McLuckie v. Chicago, M., St. P. & P. R. Co. (1959), 5 Wis. 2d 652, 94 N. W. 2d 182.
But in addition to this evidence concerning the operation of the signals, there was sufficient evidence for the jury to find the railroad negligent in respect to the maintenance of the signals. There was testimony that the lenses on the signals were so dirty and the sun at that time of the morning shone at such an angle that a motorist proceeding west could not see the signals. The railroad argues the lenses were cleaned six days before the accident and that it is not responsible for the angle of the sun. In respect to the cleanliness of the lenses so as to properly perform its function, several witnesses testified that they noticed immediately after the accident that the lights were dirty and hard to see. Frank Fetzer, Sr., testified they were hard to see unless the dirt was rubbed off. Officer Craig said he found them very dusty and dirty; John Zarske said they were dirty and it was practically impossible to see if the lights were on; Charles Waite said he had to get 20 feet from the lights to see whether they were on because they were so dirty. Both Zarske and Craig testified that at the time of the accident the angle of the sun also made it hard to see the lights.
Craig, John Deglmann and Kenneth Rasmussen testified they had frequently crossed this track in a westerly direction at this time in the morning and had difficulty seeing the signal lights because of the angle of the sun and the often dirty condition of the lenses. Deglmann *18 said when he was 100 to 150 feet from the track he could not see if the lights were on. Zarske testified that two days before the accident at about the same time in the morning, he had almost been hit by a train at this crossing and he had difficulty in seeing the flashing signals because the lenses had road dirt and grime on them and the sun was shining under the visor. Waite testified that on the same morning that Zarske barely stopped in time at the track he almost hit Zarske because the signal lights could not be seen working because of sun and dirt. On behalf of the railroad, Carl F. Einsiedel, the railroad's signal maintainer, testified he cleaned these lenses six days before the Kurz accident and four days before Zarske's near accident.
A railroad has a duty to maintain its signal equipment so as to give reasonable notice at crossings; this includes clean lenses, sufficient wattage of the bulbs, and a design of signals which will reasonably perform the function of giving the intended warning, not only at night but during the day. While the railroad cannot change the angle of the sun, nor is it responsible therefore, the glare of the sun on the warning device was not such an unusual phenomenon that it cannot be reasonably foreseen and some reasonable measures taken to prevent it. If this cannot be done by shields, which these signals seem to have, then these signals should be supplemented with some other type of safety device. We think the evidence was sufficient to sustain a finding that the railroad was negligent both in the operation of the signals and in their maintenance.
The railroad argues the evidence is not sufficient to find it causally negligent in respect to speed, lookout, horn and bell. It is equally well argued that there is sufficient credible evidence for the jury to so find. Even in the absence of a public service commission's *19 order[1] setting a maximum speed limit at this crossing, the speed of a train may constitute negligence if dangerous or unusual circumstances are present and the speed is unreasonable in the light of them or the train was in violation of its own rule establishing a speed limit. Dombeck v. Chicago, M., St. P. & P. R. Co. (1964), 24 Wis. 2d 420, 431, 432, 129 N. W. 2d 185. The first of these exceptions was created by McLuckie v. Chicago, M., St. P. & P. R. Co., supra, at page 657, and the second by Schulz v. Chicago, M., St. P. & P. R. Co. (1952), 260 Wis. 541, 544, 545, 51 N. W. 2d 542, at 549. It is argued there is no evidence the train was in violation of its own rule establishing a speed limit, but the lack of such evidence is due to the objection of the railroad to evidence of what its speed limit was at this crossing. Consequently, this argument has no force.
We are asked to distinguish the McLuckie Case because there was no peculiar or unusally dangerous circumstance attendant on this crossing. This argument will be considered in connection with the question of whether the instructions on the extrahazardous crossing was proper. But if this was an extrahazardous crossing, which the trial court believed it was, then a jury question was presented whether 25 miles per hour was a reasonable speed.
In respect to lookout, it is argued the members of the crew saw what there was to see, but there was testimony they did not see cars crossing the track just ahead of the engine, giving rise to the presumption the signals were not working or possibly the autoists thought it was safer to cross than attempt to stop. We think there was a jury question as to lookout and while the evidence in respect *20 to the horn and bell is not extensive, they, too, were proper jury questions.
It is unnecessary for us to find there is sufficient evidence to sustain a finding of negligence of the railroad in each of these four respects because the record does not show in what respect the jury found the railroad negligent. It may very well be that the jury found the railroad negligent in the operation and maintenance of the signals and not in respect to speed, lookout, bell and whistle, or possibly in speed but not the latter three respects. We think there is sufficient evidence to find the railroad causally negligent at least in respect to speed and this negligence, with its negligence in respect to the signals, is sufficient to sustain a contribution of 60 percent of the total negligence of the parties.
The last question to be considered is whether the jury was properly instructed that if this crossing was ultrahazardous or unusually dangerous, the railroad might be negligent for not providing more adequate warning devices. At the trial at the request of Kurz, the court gave an instruction concerning an ultrahazardous crossing.[2] *21 A railroad at common law has the duty of ordinary care to install and maintain warning devices at a grade crossing[3] and to use such speed in crossing public highways as is reasonably adequate under the conditions and circumstances existing at the crossing to protect motorists and which is commensurate with the requirements of the public safety and consistent with the public need for adequate and expeditious train service. This duty is not necessarily limited by statutory requirements such as sec. 192.29 (5), Stats., relating to railroad signs. However, the public service commission under sec. 195.28 may determine and make an order in respect to the adequacy of existing warning devices at a railroad crossing and under sec. 195.29 the commission may determine the type of highway-railway crossing which the public safety demands.
The term "extrahazardous crossing" is perhaps misleading but should be understood to mean the common-law rule of ordinary care requires more safety devices at a crossing than are prescribed by the statutes and in some states more than is prescribed by an order of the state agency charged with the duty of determining the adequacy of safety devices in relation to the hazards of a particular railroad crossing. An "ultrahazardous crossing" is a relative term and simply means the hazards of the railroad crossing demand more or better safety devices than it has or that the maximum speed at which a train may cross such crossing should be lower and commensurate with the hazards.
The railroad contends the giving of this instruction was error because the crossing was not ultrahazardous as a matter of law and because the public service commission had made an order in respect thereto. The signals at the Bluemound crossing were installed pursuant to plans *22 first approved by the commission in 1930 and changes thereof approved as late as 1961. While the public service commission approved the signals as requested by the railroad, it did not make any order in respect to the crossing. In Schulz v. Chicago, M., St. P. & P. R. Co., supra, instructions were approved to the effect that it might not be enough for a railroad to comply with the statutes in respect to warning signs at a crossing if such crossing was unusually dangerous. In the opinion, it was conceded that if the public service commission had ordered a crossing to be guarded in a particular manner and the railroad had done as directed, it would not be required to go farther in satisfying a jury's idea of adequate protection.
The "extrahazardous crossing" doctrine in Wisconsin is an exception to the common-law doctrine of reasonable care when the public service commission has substituted its judgment for the reasonableness of safety devices required at a particular crossing. In effect, the commission exclusively determines the extent of the railroad's duty of care. In Minnesota, however, the extrahazardous doctrine is well established and is much broader than Wisconsin's. Minnesota holds that even though a railroad complies with the statute or with an order of the public service commission or its equivalent, the jury can still find the railroad has failed in its common-law duty if the crossing is extrahazardous.[4] The statement in Schulz to *23 the effect that a railroad's duty ends with compliance of the order of a public service commission was followed in Verrette v. Chicago & N. W. Ry. Co. (1968), 40 Wis. 2d 20, 161 N. W. 2d 264, where we held the commission had so acted and its jurisdiction under sec. 195.29, Stats., was exclusive and therefore the safe-place statute could not apply to the area covered by the commission's order.
However, the general jurisdiction granted to the public service commission to require safety devices or to regulate railroad speed is not enough to immunize the railroad from the doctrine of common-law negligence. The public service commission must exercise its jurisdiction and make an order based upon the safety requirements of the crossing; the approval of plans for signals proposed by the railroad without more is not enough. Consequently, the instruction in this case was proper if the evidence concerning the hazards justified it.
The railroad argues all railroad crossings are hazardous and this one was not particularly so and was not ultrahazardous. There was only one track and the view for a municipal crossing was fairly open especially in the quadrant involved. The speed of the train was only 25 miles per hour or at the most 30 miles per hour and while the highway traffic was heavy the railroad traffic was light or about 16 freight trains a month.
As stated in Cameron v. Northern Pacific Ry. Co. (1951), 234 Minn. 355, 48 N. W. 2d 540, there is no hard-and-fast rule for distinguishing between an ordinary *24 railroad crossing and one which is extrahazardous. But we think the physical conditions of the crossing, its use by the railroad, the amount of traffic on the highway, the obstructions, the grade, and other factors pertaining to safety are all factors to be considered in establishing whether the safety features prescribed or used are adequate to give reasonable warning of hazards to those using the highway. Here, Bluemound Road was an extremely busy highway carrying some 27,000 cars daily and those autoists familiar with the crossing knew of the infrequent use of this single track by the railroad. The dominant highway was Bluemound Road and the infrequency of the railroad's use of this crossing had a tranquilizing effect on those automobile drivers who were familiar with the crossing. This is what the experts term a "surprise factor." The railroad track was obstructed by the Red Coach Inn for those going west on Bluemound Road. One could not see very far to the north until he was past the Red Coach Inn, or about 100 feet from the track. Trees and bushes hid or camouflaged the track north of the crossing and because Bluemound Road was four lanes, there was bound to be interference with the view of the westward motorists on the inside lane by the cars in the outside lane. The general setting of the crossing was characterized in the testimony as cluttered and inclined to divert the attention of a motorist on Bluemound Road on which the speed limit at this point was 50 miles per hour.
The question involved is not whether more or better warning devices were possible but whether it was reasonable to expect more than electric signals at such a crossing. There was testimony that duplex or back-to-back lights on the median signals, automatic gates, greater wattaged light bulbs in the signals, a longer ringing circuit, were all possible and had greater safety factors. We think it was a proper jury question whether under *25 these facts this crossing reasonably required better and more efficient warning equipment and thus the trial court was correct in giving the hazardous-crossing instruction.
By the Court.Judgment affirmed.
NOTES
[1] The setting of railroad train speeds at grade crossings is the exclusive jurisdiction of the public service commission. See sec. 192.29 (1), Stats.
[2] The instruction given was as follows:

"If a particular grade crossing over a public highway is ultrahazardous or unusually dangerous, and the Public Service Commission has not assumed jurisdiction for formal order as to the warning devices at such grade crossing, a railroad, in the exercise of ordinary care, may be required to take additional precautions or to erect more adequate warning devices.
"You are instructed that the defendant railroad had the duty to keep and maintain such means to protect motorists as were adequate under the circumstances and conditions existing at the grade crossing in question. If, because of the amount of automobile traffic, obstruction to view, or any other circumstances or conditions shown by the evidence, you find that the means employed by the defendant railroad were not adequate to protect motorists on the highway, then you must find the defendant negligent."
See Wis J ICivil 1410, for duty to maintain crossing signs required by statute.
[3] See also: Statutory requirement of sec. 195.26, Stats., which recognizes the duty of a railroad generally in respect to providing adequate safety devices.
[4] Under ch. 219, Minn. Stats. Annot. (Supp. 1971), the Railroad and Warehouse Commission may order a railroad to install additional safeguards, including crossing gates, if after an investigation and hearings it finds such additional safeguards are required. Sec. 219.24, Minn. Stats. Annot. Sec. 219.19, Minn. Stats. Annot. gives the commission authority to order the railroad to provide additional approach warning signs, to be installed by the commission. In Rhine v. Duluth M. & I. R. Ry. Co. (1941), 210 Minn. 281, 297 N. W. 852, it was stated a railroad's compliance with the commission's orders under Minn. Stat. 1927, secs. 4743-1 to 4743-17 did not preclude liability if the crossing is ultrahazardous. Secs. 219.24 and 219.19 were formerly Minn. Stats. 1927, secs. 4743-10 and 4743-4. More recently, in Haukom v. Chicago G. W. Ry. Co. (1964), 269 Minn. 542, 551, 132 N. W. 2d 271, 277, it was stated:

"It is not disputed that Great Western complied with the statutes and the regulations of the Railroad and Warehouse Commission in maintaining warning signs at the crossing along Highway No. 56. The question is whether the crossing was extrahazardous so as to require warnings or other precautionary measures in addition to those required by the commission or by statute."