Allan HOFFMANN and Beverly Hoffmann,
Plaintiffs-Respondents-Cross-Appellants,

v.

WISCONSIN ELECTRIC POWER COMPANY, Defendant-
Appellant-Cross-Respondent-Petitioner.†

Supreme Court

*No. 00–2703. Oral argument November 6, 2002.—Decided
June 25, 2003.*

2003 WI 64

(Also reported in 664 N.W.2d 55.)

† Motion for reconsideration denied 9-12-03.

266

For the defendant-appellant-cross-respondent-petitioner there were briefs by *Owen Thomas Armstrong, John A. Casey,* and *Quarles & Brady LLP,* Milwaukee, and *Terrence C. Thom* and *Quale, Feldbruegge, Calvelli, Thom & Croke, S.C.,* Milwaukee, and oral argument by *Owen Thomas Armstrong.*

For the plaintiffs-respondents-cross-appellants there was a brief by *Lynn R. Laufenberg* and *Laufenberg & Hoefle, S.C.,* Milwaukee, and *Scott Lawrence* and *Lawrence & Des Rochers, S.C.,* St. Nazianz, and oral argument by *Lynn R. Laufenberg* and *Scott Lawrence.*

An amicus curiae brief was filed by *H. Dale Peterson, Heather L. Boudreau,* and *Stroud, Willink & Howard, LLC,* Madison, on behalf of the Wisconsin Farm Bureau Federation, Cooperative, the National Farmers Organization, and the Dairy Business Association.

An amicus curiae brief was filed by *David A. Ludwig,* Madison, on behalf of the Public Service Commission of Wisconsin.

An amicus curiae brief was filed by *Trevor J. Will, G. Michael Halfenger, Eric L. Maassen,* and *Foley & Lardner,* Milwaukee, on behalf of the Wisconsin Utilities Association.

An amicus curiae brief was filed by Naomi E. Soldon, *Jill M. Hartley,* and *Previant, Goldberg, Uelmen, Gratz, Miller & Brueggeman, S.C.,* Milwaukee, on behalf of the International Brotherhood of Electrical Workers, Local 2150, AFL-CIO.

An amicus curiae brief was filed by *Stuart G. Mondschein* and *Wheeler, Van Sickle & Anderson, S.C.,* Madison, on behalf of the Wisconsin Electric Cooperative Association.

An amicus curiae brief was filed by *William C. Gleisner, III,* and *Law Offices of Williams C. Gleisner, III,* Milwaukee, and *Rhonda L. Lanford* and *Habush Habush & Rottier, S.C.,* Madison, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *George Burnett, Sara Ramaker, and Liebmann, Conway, Olejniczak & Jerry, S.C.,* Green Bay, on behalf of the Six Districts of the Granton Amish Community and the Spencer Amish Church.

¶ 1. WILLIAM A. BABLITCH, J. Wisconsin Electric Power Company (WEPCO) petitioned this court for review of an unpublished decision of the court of appeals,[1] which upheld a jury's verdict in favor of Wisconsin farmers, Allan and Beverly Hoffmann. At issue is whether there was sufficient evidence to support the jury's verdict that the Hoffmanns' dairy herd was harmed by electrical current resulting from a deteriorated WEPCO electrical distribution cable. Because we conclude that there was ample evidence to support the jury's finding that WEPCO's deteriorated electrical distribution cable was a cause of damage to the Hoffmanns' dairy herd, we uphold the court of

---

[1] *Hoffmann v. Wis. Electric Power Co.,* No. 00–2703, unpublished slip op. (Wis. Ct. App. Apr. 4, 2002).

appeals' decision on this issue. WEPCO also petitioned this court to review whether the circuit court erroneously exercised its discretion by ordering a specific method of abatement that was requested by the Hoffmanns. We conclude that the circuit court erroneously exercised its discretion in ordering the specific electrical system requested by the Hoffmanns because the court (1) relied on the improper factor that the Hoffmanns were the "victors" of the lawsuit and (2) failed to take into account relevant factors, such as the safety and reliability of the system ordered and whether the system complies with Wisconsin's electrical code. Accordingly, we reverse that part of the court of appeals' decision that upheld the circuit court's abatement order, and remand to the circuit court for Waupaca County to properly exercise its discretion in ordering a method of abatement.

## I. FACTS AND PROCEDURAL HISTORY

¶ 2. The Hoffmanns have operated a dairy farm in New London, Wisconsin since 1977. That same year, WEPCO installed an underground, bare-concentric, multi-grounded electrical distribution cable along a road that is adjacent to the Hoffmanns' farm. From 1977 to 1987, the Hoffmanns built a dairy herd, which was generally healthy and productive. However, they felt their milk production was not as high as it should have been, based on state averages for milk production.

¶ 3. In the late 1980s, the Hoffmanns noticed that their cows were behaving erratically, kicking at milkers, acting listless and lame, and failing to eat and drink normally. The herd also had a high calf mortality rate. The Hoffmanns worked to address the problems with their dairy herd, including installing a new free stall barn in 1994, and working closely with their herd

veterinarian and nutritionist. The Hoffmanns made a number of management decisions over the years to improve the herd's health and milk production, but despite all their efforts, there was no significant change, and milk production continued to significantly drop. After examining possible causes for their problems with the herd, including facilities, disease, nutrition, reproduction, and udder health, the Hoffmanns' veterinarian concluded that the only factor that had not been eliminated was electricity.

¶ 4. In response, the Hoffmanns made several electrical changes on their farm from 1988 to 1999. One of the changes involved installing an equipotential plane in their newly constructed milking parlor in order to deal with potential "stray voltage." "Stray voltage" has been defined by the Wisconsin Public Service Commission (PSC) as voltage that is present across points (generally grounded metal objects), in which an electrical current is produced when an animal simultaneously contacts two conductive points to complete a circuit, which allows an electrical current to flow.[2] While an equipotential plane may reduce traditional stray voltage as measured by "cow contact points,"[3] there was testimony at trial that equipotential planes do not reduce all electrical currents in an animal's environment and may actually increase the ground current

___

[2] Public Service Commission of Wisconsin, Investigation on the Commission's Own Motion Into the Practices, Policies and Procedures Concerning Stray Voltage for Electric Distribution Utilities in Wisconsin, Docket #05–EI-106 at 5 (1989) (Docket 106).

[3] "Cow contact points" are areas where an animal simultaneously accesses two points of different voltage of a sufficient magnitude, which causes an objectionable current to flow through the animal. *Id.* at 8.

beneath the animal. The potential effect of ground current was discussed by expert witnesses for the Hoffmanns, who differentiated between traditional stray voltage and "non-traditional" stray voltage, such as ground current. "Ground currents" are currents that are associated with the grounding system of an electrical utility's primary distribution system and an individual's secondary system (e.g. barn wiring).[4] Once electrical currents leave a grounding system and go into the earth, they are referred to as "earth currents."[5] According to the Hoffmanns, in addition to traditional stray voltage, "non-traditional" stray voltage, such as ground or earth currents, can be harmful to animals.

¶ 5. In an attempt to divert a portion of the ground current, the Hoffmanns had a ring of copper wire buried around the dairy complex. After installing the copper wire, calf mortality improved, but milk production remained erratic. The Hoffmanns also contacted WEPCO to test for stray voltage on their farm. In November 1995, WEPCO tested for traditional stray voltage on the Hoffmann farm, in accordance with the PSC's protocol as set forth in Docket 106, and concluded that the current detected was below the PSC's "level of concern." The "level of concern" has been defined by the PSC as the level above which corrective or mitigative

[4] Public Service Commission of Wisconsin, Investigation on the Commission's Own Motion Into the Practices, Policies and Procedures of Providing Electric Utility Service as It Relates to the Potential Adverse Effects on Dairy Livestock From Electromagnetic Fields, Ground Currents, and Direct Currents Associated With That Service, Docket #05–EI-108 at 3 (1995) (Docket 108).

[5] Rural Electric Power Services, "Glossary of Terms," 10 (2002), at http://psc.wi.gov/electric/newsinfo/document/glossary .pdf.

action should be taken if production or behavioral problems exist, which is one milliampere in the "cow contact" areas.[6] One of the Hoffmanns' expert witnesses testified that the WEPCO engineer who visited the farm told him that WEPCO would also test for "non-traditional" stray voltage; however, this testing was never conducted by WEPCO.

¶ 6. In an unrelated testing, WEPCO examined the underground, bare-concentric, multi-grounded electrical distribution cable that served the Hoffmanns' farm, as part of a developmental test protocol for corrosion. The cable was found to have deteriorated more rapidly than expected due to corrosion and had a bad splice, which was replaced. According to the trial testimony, there was no way to predict future deterioration of the cable and only follow-up testing could confirm whether the cable was still performing in an acceptable manner. WEPCO refused to remove and replace the bare-concentric cable, instead favoring the less expensive option of testing and mitigation. WEPCO further refused to re-test the cable until shortly before trial, and at the Hoffmanns' expense. Upon re-testing, the cable showed further deterioration. The expert witnesses for WEPCO testified that the deterioration of the cable did not present any significant threat of traditional stray voltage. However, the expert witnesses for the Hoffmanns contended that the deteriorating cable led to increased "non-traditional" stray voltage that adversely affected the dairy herd.

¶ 7. In June 1997, the Hoffmanns sued WEPCO on theories of negligence and nuisance, alleging that WEPCO's electrical distribution system was causing excessive amounts of electrical current to flow through

---

[6] Docket 106 at 4.

their farm, which was damaging the health and productivity of their livestock. The Hoffmanns sought damages and injunctive relief in the Circuit Court for Waupaca County, Philip M. Kirk, Judge. After a month-long trial, the jury found in favor of the Hoffmanns on both the negligence and nuisance counts and assessed damages in the amount of $1,241,000.[7] The circuit court entered a money judgment based on the jury's verdict and entered an abatement order requiring WEPCO to replace the underground, bare-concentric, multi-grounded electrical distribution cable with an overhead, ungrounded delta system. WEPCO appealed both the money judgment and the abatement order. The circuit court refused to grant a stay of execution of the money judgment, but it stayed enforcement of the abatement order, pending appellate review.

¶ 8. In an unpublished per curiam opinion, the court of appeals affirmed both the money judgment and the abatement order of the circuit court. The court of appeals affirmed the circuit court's decision to uphold the jury's verdict because the verdict was supported by the record, and the court affirmed the abatement order because it was within the discretion of the circuit court.

---

[7] On the special verdict form submitted to the jury, the jury answered "Yes" to the following questions:

(1) Was Wisconsin Electric Power Company negligent with respect to the electrical service and facilities which it provided to the Hoffmann farm?

(2) Was such negligence a cause of any damage sustained by the Hoffmanns?

(3) Did Wisconsin Electric Power Company distribute electricity to the Hoffmann farm in a manner that constituted a nuisance?

(4) Was such nuisance a cause of any damage sustained by the Hoffmanns?

WEPCO petitioned this court to review whether the jury's verdict should be upheld and whether the circuit court erroneously exercised its discretion by ordering a method of abatement specifically requested by the Hoffmanns. This court granted WEPCO's petition for review on June 11, 2002.

## II. STANDARD OF REVIEW

¶ 9. Appellate review of a jury's verdict is very limited, narrow, and circumscribed. *See, e.g., Morden v. Cont'l AG,* 2000 WI 51, ¶ 38, 235 Wis. 2d 325, 611 N.W.2d 659. This court must sustain a jury verdict if there is any credible evidence to support the verdict. *Id.; Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 450, 280 N.W.2d 156 (1979); *see also* Wis. Stat. § 805.14 (2001–02).[8] This court views the evidence in the light most favorable to a jury's verdict and must sustain the verdict if there is any credible evidence in the record to support it, regardless of whether there is evidence to support a different verdict. *Meurer,* 90 Wis. 2d at 450–51. In addition, the credibility of witnesses and the weight given to their testimony is for the judgment of the jury, not an appellate court. *Morden,* 235 Wis. 2d 325, ¶ 39. Moreover, special deference is afforded to a jury determination that has been upheld by the circuit court. *Kuklinski v. Rodriguez,* 203 Wis. 2d 324, 331, 552 N.W.2d 869 (Ct. App. 1996). This court will uphold a jury verdict even if it is contradicted by evidence that is stronger and more convincing. *Morden,* 235 Wis. 2d 325, ¶ 39; *Weiss v. United Fire & Cas. Co.,* 197 Wis. 2d 365, 390, 541 N.W.2d 753 (1995). Therefore, this court

---

[8] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

will not upset a jury verdict unless there is such a complete failure of proof that the verdict must have been based on speculation. *Coryell v. Connecticut,* 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979).

¶ 10. The standard of review of a circuit court's decision to grant injunctive relief is within the sound discretion of the circuit court. *Sunnyside Feed Co., Inc. v. City of Portage,* 222 Wis. 2d 461, 468, 588 N.W.2d 278 (Ct. App. 1998) (citing *State v. Seigel,* 163 Wis. 2d 871, 889, 472 N.W.2d 584 (Ct. App. 1991)). Therefore, an injunction ordered by a circuit court will be reviewed to determine whether there was an erroneous exercise of discretion. *Id.*

## III. ANALYSIS

¶ 11. At the outset, we briefly address WEPCO's contention that the PSC's findings have the force and effect of law, having the same status as statutes enacted by the legislature. WEPCO essentially argues that pursuant to its authority under Wis. Stat. § 196.857,[9] the cow contacts protocol, as established by the PSC in Docket 106, is the only valid measurement of stray voltage and its effect on cows. According to the PSC's cow contacts protocol, a cow cannot be harmed by stray

---

[9] Wis. Stat. § 196.857 provides:

(1g) Program Elements. (a) The commission shall establish and administer a stray voltage program. The program shall focus on regulation, education, inspection and investigation relating to stray voltage.

(b) The commission shall identify standardized test procedures check lists and equipment to be used by public utilities to investigate stray voltage. The commission may audit the results of investigations.

voltage if the electrical current measures less than one milliampere. Thus, WEPCO contends that without this necessary element of causation, the Hoffmanns cannot prevail.

¶ 12. We note that it is a "well-established rule that the enactment of safety statutes or legislation giving a commission jurisdiction over a certain activity does not abolish the duty arising under common-law negligence." *Kemp v. Wis. Elec. Power Co.*, 44 Wis. 2d 571, 579, 172 N.W.2d 161 (1969) (citing *Schulz v. Chicago M., St. P. & P. R. Co.*, 260 Wis. 541, 51 N.W.2d 542 (1952)). This court has determined that

> [A] safety statute merely establishes a minimum standard of care and the conduct, even though sanctioned or in conformity with the statute, is not thereby necessarily relieved of conforming to the common-law requirements of ordinary care. In any event the establishment of a statutory definition of negligence per se does not thereby result in a preemption of the entire negligence question. There remains the question of possible common-law negligence.

*Blanchard v. Terpstra*, 37 Wis. 2d 292, 299, 155 N.W.2d 156 (1967). *See also* Restatement (Second) of Torts, § 288C (1979).

¶ 13. Furthermore, it is well-recognized that a "statute does not change the common law unless the legislative purpose to do so is clearly expressed in the language of the statute. To accomplish a change in the common law, the language of the statute must be clear, unambiguous, and peremptory." *Fuchsgruber v. Custom Accessories, Inc.*, 2001 WI 81, ¶ 25, 244 Wis. 2d 758, 628 N.W.2d 833 (citations omitted). Nowhere in the lan-

278

guage of chapter 196 of the Wisconsin Statutes is common-law negligence, with respect to stray voltage, changed or altered. In fact, such a change has been specifically considered and was rejected. In Wisconsin's initial budget bill for 2001–2002, a provision was included that would have changed the standards for civil liability with respect to stray voltage. The bill proposed creating a statute, providing that "[a] public utility is immune from liability for any damage caused by or resulting from stray voltage contributed by the public utility if that stray voltage is below the level of concern established by the public service commission . . . ." 2001 S.B. 55, § 3866. However, after severe public criticism, the provision was withdrawn and was never passed into law.[10]

¶ 14. Based on the above, we must decline WEPCO's invitation to hold that it cannot be liable to the Hoffmanns if there are no cow contact measurements of more than one milliampere because the PSC's findings have the force and effect of law. Moreover, even if WEPCO is correct, the Hoffmanns presented an alternative theory at trial: that non-traditional stray voltage was harming their dairy herd and that traditional stray voltage is not the only kind of electrical current that can harm animals. The jury believed the case presented by the Hoffmanns that non-traditional stray voltage was a cause of the damage to their dairy herd. Therefore, whether the PSC's findings regarding cow contact measurements have the force and effect of law is not dispositive in this case since these findings

---

[10] *See* Deborah Kades & Chris Hardie, "Governor retracts utilities' immunity," The LaCrosse Tribune, Mar. 22, 2001, at A-1.

only deal with traditional stray voltage, not non-traditional stray voltage.[11] Accordingly, our inquiry focuses on the sufficiency of the evidence for the jury's verdict that non-traditional stray voltage was a cause of the damages sustained by the Hoffmanns. Specifically, we examine whether there is any credible evidence to support the verdict. *Morden,* 235 Wis. 2d 325, ¶ 38.

## A. Sufficiency of Evidence: Negligence and Nuisance

¶ 15. The jury found that WEPCO was negligent in providing electrical service to the Hoffmann farm and that its distribution of electricity to the farm constituted a nuisance. The jury found that WEPCO's negligence and the nuisance were each a cause of the damages sustained by the Hoffmanns.[12] It is undisputed that the Hoffmanns were having problems with

---

[11] In Docket 106, the PSC made findings regarding the effect of "traditional" stray voltage on cows, utilizing "cow contact" measurements. In contrast, the PSC's findings in Docket 108 were inconclusive regarding "non-traditional" stray voltage, such as ground current.

[12] The circuit court gave several instructions to the jury, including instructions on the burden of proof, negligence, nuisance, causation, and damages. The circuit court instructed the jury, in part:

> The burden of proof, rests upon the party contending that the answer to a question should be "yes." This burden is to satisfy you to a reasonable certainty by the greater weight of the credible evidence that "yes" should be the answer.

> Credible evidence is evidence which in the light of reason and common sense is worthy of your belief.

> A person [company] fails to exercise ordinary care, when, without intending to do any harm, it does something or fails to do something under circumstances in which a reasonable person would foresee that by its action or failure to act, it will subject a person or property to an unreasonable risk of injury or damage.

the health and milk production of their dairy herd. Rather, the point of contention between WEPCO and the Hoffmanns is whether WEPCO's delivery of electricity to the Hoffmann farm was a cause of these problems.

¶ 16. Both WEPCO and the Hoffmanns produced various expert witnesses who testified regarding the effect of electricity on the health and milk production of dairy cows. In Wisconsin, a witness who is qualified as an expert by knowledge, skill, experience, training or education may give his or her expert opinion if his or her scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue. *See* Wis. Stat. § 907.02. In cases where there is conflicting expert testimony, it is up to the jury, as the trier of fact, to determine weight and credibility. *Schultz v. State*, 87 Wis. 2d 167, 173, 274 N.W.2d 614 (1979). As Judge Kirk commented in his decision on motions after verdict, the jury determines the weight of expert testimony and, in this case, the jury chose the Hoffmanns' experts.

The cause questions ask whether there was a causal connection between the negligence of Wisconsin Electric Power Company and any damages sustained by the Hoffmanns. These questions do not ask about "the cause" but rather "a cause." The reason for this is that there may be more than one cause of damage. Before you find that negligence was a cause of damage, you must find that the negligence was a substantial factor in producing the damages.

A nuisance is an unreasonable activity that interferes substantially with another person's interest in the private use and enjoyment of land. To be a nuisance, an activity must cause significant harm.

If ordinary persons living in the community would regard the activity in question as substantially offensive, seriously annoying, or intolerable, then the interference is significant.

¶ 17. During the course of the trial, the Hoffmanns and their witnesses testified that non-traditional stray voltage, or ground currents, resulting from WEPCO's deteriorated, underground, bare-concentric electrical distribution cable, was a cause of the problems with the Hoffmanns' dairy herd. The PSC made findings in Dockets 106 and 115[13] that dealt with the effect of traditional stray voltage on cows; however, in Docket 108, the findings of the PSC were inconclusive with respect to the effect of ground currents or non-traditional stray voltage on cows. Although the PSC's findings were inconclusive regarding the effect of ground currents, the Hoffmanns' expert witnesses testified that there can be negative effects on the health and performance of dairy cows when electrical currents are flowing through their environment, regardless of the magnitude of cow contact measurements for traditional stray voltage.[14] Thus, the Hoffmanns argued that despite WEPCO's assertions to the contrary, cow contact measurements do not tell the whole story about the negative impact of electrical current on dairy cows.

¶ 18. The Hoffmanns' expert witnesses also disputed studies introduced at trial by WEPCO's expert witnesses regarding the effect of electricity on cows. The Hoffmanns' expert witnesses testified that there is

---

[13] Public Service Commission of Wisconsin, Investigation on the Commission's Own Motion Into the Practices, Policies and Procedures Concerning Stray Voltage for Electric Distribution Utilities in Wisconsin, Docket #05–EI-115 (1996) (Docket 115).

[14] *See, e.g.,* Gerald R. Bodman, P.E., *Ground Currents: A Cause of Undesirable Animal Performance?,* Address at the 1994 Winter Meeting of the American Society of Agricultural Engineers (Dec. 13–16, 1994).

a significant difference between controlled laboratory studies, where cows are exposed to electricity for only short periods of time, and constant, long-term exposure to electrical currents, which is what the Hoffmanns contended that their cows had experienced.

¶ 19. The Hoffmanns' witnesses further testified that the substantial electrical current on the Hoffmann farm was due to WEPCO's deteriorated, underground cable. There was testimony that in testing the electrical current on the farm using a ground ring, there was an increase in earth current when the electrical load on WEPCO's underground line was increased, rather than an increased return current on the primary neutral, where the current was supposed to be. In contrast, when the same increased load was placed on a farm generator, there was no increase in earth current. There was also trial testimony that WEPCO employees had told the Hoffmanns that this particular bare-concentric cable had been causing problems for years, but WEPCO had not done anything about it.

¶ 20. The Hoffmanns also presented evidence that WEPCO was negligent in failing to address the problems caused by non-traditional stray voltage on their farm. The Hoffmanns argued that WEPCO was negligent when it realized that the underground, bare-concentric cable was deteriorating at a faster rate than expected due to corrosion, but yet failed to remove and replace the line. One of the Hoffmanns' expert witnesses, William English, P.E., testified that this kind of cable was originally thought to last 25–30 years, but that they have generally only lasted 10–15 years. Moreover, Mr. English testified that this kind of cable is no longer generally used in the utility industry due to its inadequate performance. Consistent with Mr. English's testimony, when WEPCO re-tested the cable shortly

before trial, it showed further deterioration from the first time it was tested in 1989.

¶ 21. In addition, the Hoffmanns themselves testified regarding their extensive efforts to address the problems with their dairy herd, which were largely to no avail. The Hoffmanns, with the assistance of their herd veterinarian and nutritionist, explored and exhausted possible causes of the poor health and reduced milk production of their cows, and ultimately concluded that electricity was the only source that had not been eliminated.

¶ 22. Based on all the above, we agree with Judge Kirk that the "entire evidentiary picture [as] painted by the plaintiffs' experts and [the] plaintiffs personally . . . is sufficient to sustain the verdict." As the trier of fact, the jury determines the weight and credibility of the evidence presented, and we will uphold their findings if there is any credible evidence to support their verdict. In light of the substantial testimony of the Hoffmanns and their witnesses, we conclude that there was ample evidence for the jury to find that non-traditional stray voltage resulting from WEPCO's deteriorated, underground, bare-concentric electrical distribution cable was a cause of damage to the Hoffmanns' dairy herd.

B. Abatement Order

¶ 23. A circuit court's decision to grant an injunction, determine its form, and determine its scope, are within the broad discretion of the circuit court. *City of Wis. Dells v. Dells Fireworks, Inc.,* 197 Wis. 2d 1, 15, 539 N.W.2d 916 (Ct. App. 1995) (citing *Seigel,* 163 Wis. 2d at 889–90). When a party seeks injunctive relief, a circuit

court "exercises its discretion in deciding whether to grant injunctive relief, and if so, in what form." *Forest County v. Goode,* 219 Wis. 2d 654, 670, 579 N.W.2d 715 (1998). Thus, it is within a court's discretion to order a specific method of abatement. *See, e.g., Bubolz v. Dane County,* 159 Wis. 2d 284, 296, 464 N.W.2d 67 (Ct. App. 1990) ("Injunctive relief should be tailored to the necessities of the particular case." (citing *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 61 (1975))). This court has recognized that in ordering an injunction, a court is not required to specify the method of abatement, but such specificity may be ordered in certain cases.

> Generally the means whereby the nuisance is to be abated is left to the direction of the defendant tortfeasor. If the means by which the defendant may abate the nuisance is immaterial and the court is looking solely to the end-result, it has been said that the means of abating the nuisance is of no concern of the court. . . . However, there are situations in which the balancing of convenience or equities is attempted by the court and the decree does provide in detail how the nuisance shall be abated or partially controlled. It is recognized the court may require the defendant to adopt methods and appliances where their adoption will avoid the conditions complained of.

*Costas v. Fond du Lac,* 24 Wis. 2d 409, 418 129 N.W.2d 217 (1964) (citations omitted).

¶ 24. In this case, it was disputed whether merely replacing the underground, multi-grounded cable would effectively abate the nuisance or whether an overhead delta system is needed. Consequently, it appears that it was proper for the circuit court to specify the method of abatement in order to satisfactorily address the jury's finding that the Hoffmanns' cows were being damaged by the deteriorated WEPCO line.

285

¶ 25. WEPCO contends that even if the circuit court had the authority to order a specific method of abatement, the court did not have to order the method that is most likely to minimize the potential for future stray voltage problems. Conversely, the Hoffmanns contend that the circuit court does not have to order the method that is least costly or most convenient for WEPCO. While both WEPCO and the Hoffmanns raise valid considerations, neither answers the pertinent issue: whether the circuit court erroneously exercised its discretion in specifically ordering the ungrounded, overhead delta system. A circuit court erroneously exercises its discretion if it (1) fails to consider and make a record of the factors relevant to its determination; (2) considers clearly irrelevant factors or improper factors; and (3) clearly gives too much weight to one factor. *Sunnyside,* 222 Wis. 2d at 471.

¶ 26. Based on our review of the record, we conclude that the circuit court erroneously exercised its discretion in ordering the ungrounded, overhead delta system by relying on an improper factor. In the transcript of a motion hearing on September 29, 2000, Judge Kirk stated:

> The reason that I believe that the plaintiffs are entitled to this relief to the overhead delta system that they request is that they were the victors of this hard-fought lawsuit. As much as we attempt in our business to dress things up and doing [sic] justice and doing [sic] equity, there is still a lot to be said for that philosophy that, "To the victor goes the spoils."

¶ 27. In ruling on motions after verdict, Judge Kirk reasoned: "I will grant the injunctive relief as

requested by plaintiffs and include in that order that . . . the type of overhead delta system to be installed is as the plaintiff has requested . . . ." It was an erroneous exercise of discretion for the circuit court to order an overhead, ungrounded delta system based on the fact that the Hoffmanns were the "victors" of the case, and had specifically requested an overhead, ungrounded delta system. Although we understand and perhaps are even sympathetic to the circuit court's position, we cannot let it stand. The ordering of an electrical system must be based on the merits of the system with a record to support that order.

¶ 28. In addition, the circuit court erroneously exercised its discretion by failing to take into account relevant factors in ordering a method of abatement. Specifically, there appears to be uncertainty regarding the safety and reliability of an ungrounded delta system, as well as whether an ungrounded delta system complies with Wisconsin's electrical code. *See* Wis. Admin. Code ch. PSC 114 (Sept., 1997).

■■■■■

¶ 29. WEPCO claims that these kinds of findings are within the PSC's area of expertise; therefore, the circuit court erroneously exercised its discretion by not deferring to the PSC on the issue of abatement. While we conclude that the circuit court did not properly take into account all of the relevant factors in ordering a specific method of abatement, we disagree with WEPCO that the circuit court should have deferred its jurisdiction to the PSC on the abatement issue. Only a court has the authority to grant an injunction; therefore, it was not an erroneous exercise of discretion for the circuit court not to defer its jurisdiction to the PSC. *See, e.g., Madison Teachers v. Madison Sch. Dist.,* 197 Wis. 2d 731, 747, 541 N.W.2d 786 (Ct. App. 1995).

Nevertheless, based on the PSC's knowledge and expertise regarding the distribution of electricity, the circuit court could have requested and considered information and feedback from the PSC in making its determination regarding a method of abatement.[15] Specifically, the circuit court could have taken into account comments from the PSC concerning the safety and reliability of an ungrounded, overhead delta system and whether such a system complies with Wisconsin's electrical code.

¶ 30. Consequently, we conclude that remand to the circuit court is required for the court to properly exercise its discretion by considering the following relevant factors: (1) the safety and reliability of an overhead, ungrounded delta system and (2) whether an ungrounded delta system complies with Wisconsin's electrical code, and if the court deems necessary—requesting comments from the PSC regarding these factors.

¶ 31. In sum, we conclude that there was sufficient evidence to support the jury's verdict that WEPCO's deteriorated, underground, bare-concentric electrical distribution cable was a cause of damage to the Hoffmanns' dairy herd. We further conclude that

---

[15] The electrical code for the State of Wisconsin is issued and administered by the PSC, along with the department of commerce, division of safety and buildings. Wis. Admin. Code § PSC 114.001(1). In addition, Wis. Admin. Code § PSC 114.002(1) states:

> The purpose of this chapter is the practical safeguarding of persons during the installation, operation or maintenance of electric supply and communication lines and their associated equipment. This chapter contains minimum provisions considered necessary for the safety of employees and the public. [However,] [t]his chapter is not intended as a design specification or an instruction manual.

remand to the circuit court is required on the abatement issue for the court to properly exercise its discretion in ordering a method of abatement.

*By the Court.*—The decision of the court of appeals is affirmed in part, reversed in part, and remanded to the circuit court for Waupaca County for further proceedings consistent with this opinion.

¶ 32. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring).* I join the mandate. I do not join the opinion because I am concerned about key aspects of the opinion.

¶ 33. First, the majority opinion rejects WEPCO's argument that the circuit court should have deferred its jurisdiction to the PSC on the abatement issue. The reason the majority opinion gives is that "[o]nly a court has the authority to grant an injunction."[1] The majority opinion cites to *Madison Teachers, Inc. v. Madison Metropolitan School District,* 197 Wis. 2d 731, 747, 541 N.W.2d 786 (Ct. App. 1995).

¶ 34. *Madison Teachers,* however, does not provide support for the majority opinion's conclusion that the circuit court need not defer to the PSC on abatement. *Madison Teachers* involved a question of the court deferring to Wisconsin Employment Relations Commission (WERC). *Madison Teachers* states only that *WERC* cannot provide *injunctive relief.*[2] The basis for the decision in *Madison Teachers* is a statute granting courts the power to issue equitable (injunc-

---

[1] Majority op., ¶ 29.

[2] The same is true for the case *Madison Teachers* relies on, *Local 913 v. Manitowoc County,* 140 Wis. 2d 476, 485, 410 N.W.2d 641 (Ct. App. 1987).

tive) relief in WERC matters.[3] The statement in *Madison Teachers* that "only a court may grant an injunction" is gratuitous, is made without citation, and probably is no more than a truism (because by definition an injunction is a court order).

¶ 35. The majority opinion in the present case picks up this sentence from *Madison Teachers* relating to WERC and injunctions and apparently equates WERC with the PSC and "injunction" with "abatement." At least some administrative agencies do, however, have the power to issue abatement orders.[4] No one disputes the PSC's power to abate.

¶ 36. Second, the majority opinion concludes that the circuit court could have consulted with the PSC in making its determination regarding the method of abatement.[5] It offers no authority for this conclusion. The Commission's amicus brief states that the Commission "is certainly willing to advise a trial court whenever questions about public safety and utility systems arise."[6] Administrative agencies have only those powers conferred by statute.[7] What statute authorizes the PSC, under the circumstances of this case, to answer questions posed by a circuit court, to make findings in response to a court's inquiry, or to issue rulings at the request of a court?

---

[3] *Madison Teachers, Inc. v. Madison Metro. Sch. Dist.,* 197 Wis. 2d 731, 747, 541 N.W.2d 786 (Ct. App. 1995) (citing Wis. Stat. § 111.70(1)).

[4] *See State v. Dairyland Power Co-op.,* 52 Wis. 2d 45, 54, 187 N.W.2d 878 (1971).

[5] Majority op., ¶ 29.

[6] Public Service Commission Amicus Brief at 9.

[7] *See Mid-Plains Tel., Inc. v. Pub. Serv. Comm'n,* 56 Wis. 2d 780, 786, 202 N.W.2d 907 (1973).

¶ 37.　I join the mandate to remand the matter to the circuit court. The majority opinion does not prevent the circuit court from deferring to the PSC on the abatement issue.

¶ 38.　I am authorized to state that Justice ANN WALSH BRADLEY joins this concurrence.