STARK, P.J.
¶ 1 Paul Halderson, Lyn Halderson, and Arctic View Farms, LLC, (collectively, the Haldersons) filed this lawsuit against Northern States Power Company d/b/a Xcel Energy Services, Inc., (NSP) alleging that "stray voltage" attributable to NSP caused damage to the health and productivity of the Haldersons' dairy herd. A jury ultimately found in favor of the Haldersons on their negligence and private nuisance claims and awarded them just under $4.5 million in damages. The jury also made a finding of willful, wanton, or reckless conduct on the part of NSP, triggering the Haldersons' entitlement to treble damages under WIS. STAT. § 196.64(1) (2015-16).[1]
¶ 2 On appeal, the Haldersons argue the circuit court erred by granting NSP's motion for a directed verdict on their treble damages claim. NSP cross-appeals, arguing the Haldersons failed to prove negligence. In the alternative, NSP argues it is entitled to a new trial based on: (1) an erroneous jury instruction; and (2) the Haldersons' attorney's failure to reveal his past professional relationship with an uncle of one of the jurors.
¶ 3 We conclude the circuit court properly granted NSP a directed verdict on the Haldersons' treble damages claim because the evidence at trial was insufficient for a reasonable jury to find, by clear and convincing evidence, that NSP's conduct was willful, wanton, or reckless. In contrast, we reject NSP's argument that the Haldersons failed to prove negligence. We further conclude NSP forfeited its objections to the allegedly erroneous jury instruction. Finally, we conclude NSP is not entitled to a new trial based on the Haldersons' attorney's conduct because the juror in question was removed from the jury panel prior to deliberations at NSP's request, and NSP did not move for a mistrial. We therefore affirm the circuit court's judgment in all respects.
BACKGROUND
¶ 4 The Haldersons own and operate a dairy farm in Galesville, Wisconsin. In April 2012, the Haldersons filed suit against their feed supplier, Star Blends, LLC, alleging it had supplied toxic feed that caused illness and death among the Haldersons' dairy cattle. In a second amended complaint filed in October 2012, the Haldersons added NSP as a defendant, asserting claims against it for negligence and nuisance. The Haldersons alleged their farm "was accessed by stray electricity and earth current" from NSP's distribution system, which resulted in "decreased milk production at their farm," as well as "injury and damage to their dairy herd." The Haldersons ultimately filed a third amended complaint, which added an assertion that they were entitled to treble damages under WIS. STAT. § 196.64 because NSP's conduct was willful, wanton, or reckless.
¶ 5 The North Dakota Supreme Court has described the scientific principles underlying "stray voltage" as follows:
All electricity leaving an electrical substation must return to that substation in order to complete a circuit. Unless that circuit is completed, electricity will not flow. The current leaves the substation on a high voltage line which eventually connects to some electrical "appliance." After exiting the "appliance" that current must return to the substation. The neutral-grounded network provides the returning current two choices. Either it can return via the neutral line, which accounts for the second wire on our electrical poles, or it can return through the ground. These two pathways comprise the grounded-neutral network. Electricity flows through the path of lowest resistance. If there exists more resistance in the neutral line than in the ground, the current will flow through the ground to return to the substation.
Neutral-to-earth voltage or stray voltage will occur when current moves from either the neutral line to the ground or from the ground to the neutral line. It uses a cow as a pathway if that animal happens to bridge the gap between the two. A cow's hooves provide an excellent contact to the earth while standing on wet concrete or mud, while at the same time the cow is contacting the grounded-neutral system consisting of items such as metal stanchions, stalls, feeders, milkers, and waterers. The current simply uses the cow as a pathway in its eventual return to the substation.
Larson v. Williams Elec. Co-op. , 534 N.W.2d 1, 1 n.1 (N.D. 1995).
¶ 6 It is undisputed that stray voltage can be harmful to dairy cattle. In 1987, legislation was enacted requiring the Wisconsin Public Service Commission (PSC) to "establish and administer a program to provide to farmers on-site technical assistance related to stray voltage." 1987 Wis. Act 399, § 404. The PSC subsequently commenced proceedings "to gather information about stray voltage." In August 1989, the PSC issued an order (Docket 106) finding that stray voltage "can cause stress and behavioral impacts through stress on animals to the point where the animal is reluctant to eat and drink, thereby causing milk production to decrease as well as creating the circumstances for additional physical and manageability problems." The PSC further found that these problems "can cause serious economic hardship to a farmer or can indirectly result in an animal's death." The PSC established "1 milliampere steady state" as the "level of concern" for stray voltage-that is, "the point at which the average cow's behavior may be adversely affected."[2]
¶ 7 In 1990, the PSC reopened Docket 106 and held:
If the utility system is causing stray voltage in the cow contact area[3 ] greater than 1.0 milliampere and the utility fails to mitigate the stray voltage problem in a manner required by this Order and the Commission's order of August 10, 1989, the utility is not providing adequate service to that customer.
In a subsequent, July 1996 order (Docket 115), the PSC reaffirmed that a utility is "responsible for keeping its contribution of stray voltage to 1.0 [milliampere] or less."
¶ 8 A twelve-day jury trial on the Haldersons' claims against NSP took place in July and August 2017.[4] At trial, the Haldersons presented evidence that, during the early to mid-1990s, their cattle were not producing as much milk as they anticipated. Paul Halderson therefore contacted NSP and asked it to test the Haldersons' farm for stray voltage. In March 1996, Roger O'Neil, a master electrician employed by NSP, visited the Haldersons' farm to test for stray voltage. Paul Halderson reported to O'Neil that his cattle had been exhibiting various symptoms for three years, including nervousness, uneven milkout, longer milking time, reluctance to enter the barn/parlor, and heightened somatic cell counts in their milk.[5] After completing his investigation, O'Neil informed the Haldersons there were "no significant issues with stray voltage" on their farm.
¶ 9 O'Neil again tested for stray voltage on the Haldersons' farm in August 2005, April 2006, and February 2009. After each investigation, O'Neil told the Haldersons that he had not detected problematic levels of stray voltage. In the meantime, however, the condition of the Haldersons' cows continued to deteriorate. Paul Halderson testified that, by 2010, the issues with his cattle "became severely worse." He explained:
My hoof trimmer would come, and cows had such lesions on their feet that he would amputate toes on a regular basis. The toe would just virtually come dislodged from the animal. And his only repair was to amputate it above the claw. So we had several cows in what they called the Group 9 side pen, was disabled cows, and that was a severe issue that had elevated from other years.
Milk production, we had cows with such rough hair, they looked like they were out in the wild. The coats were rough. Cows' production was down. Cows weren't drinking water. Death loss was extremely high. You would get cows that would just shut down. I call them shutdown, because they quit eating, quit drinking....
¶ 10 Doctor Jeremy Schefers, a veterinarian at the University of Minnesota, ultimately recommended that the Haldersons "investigate ... the possibility of stray voltage." Schefers suggested that the Haldersons contact Lawrence Neubauer, an electrician who had been investigating stray voltage issues as an independent consultant since about 1994. Neubauer visited the Haldersons' farm in January 2011 and performed various tests. According to Neubauer, those tests revealed levels of stray voltage exceeding the PSC's one milliampere level of concern. Neubauer therefore recommended that the Haldersons request neutral isolation from NSP. In Docket 115, the PSC explained that neutral isolation is "a method of separating the primary and secondary neutrals," which "prevents any off-farm sources of stray voltage from appearing in a cow contact area." Under Docket 115, a utility is required to install a neutral isolator after receiving a request for isolation from a farmer, even if the utility's contribution to stray voltage does not exceed the PSC's level of concern.
¶ 11 NSP performed additional stray voltage testing on the Haldersons' farm after the Haldersons requested neutral isolation. NSP maintains that this testing did not reveal stray voltage levels exceeding the PSC's level of concern. Nonetheless, consistent with Docket 115, NSP installed a neutral isolator on the Haldersons' farm on January 16 or 17, 2011. In addition, at Neubauer's recommendation, the three electrical services for the Haldersons' farm were relocated and consolidated into a single service. Veterinarian Dean Franz testified there was "no comparison" between the health of the Haldersons' cattle before and after these "electrical changes." He explained, "Before, those cows did not want to live. They were ... begging you to die. And you don't see that at [the Haldersons'] farm today.... [T]hese cows are happy at [the Haldersons'] today." Paul Halderson similarly testified that, after the isolator was installed in January 2011, cull rates and health issues among his cattle decreased significantly, and their milk production increased significantly.[6]
¶ 12 After the Haldersons rested their case at trial, NSP moved to dismiss the Haldersons' claims. The circuit court took that motion under advisement. After all evidence had been submitted, NSP moved for a directed verdict on the Haldersons' claims. The court reserved ruling on that motion and submitted the case to the jury. The jury found in favor of the Haldersons on their negligence and nuisance claims and awarded them just under $4.5 million in damages. The jury also found that NSP failed to provide reasonably adequate service to the Haldersons in a willful, wanton, or reckless manner, triggering the Haldersons' entitlement to treble damages under WIS. STAT. § 196.64(1).
¶ 13 The Haldersons moved for judgment on the verdict. NSP filed various postverdict motions. As relevant to this appeal, NSP renewed its motions to dismiss and for a directed verdict. In the alternative, NSP requested a new trial on the grounds that the circuit court had improperly instructed the jury on finding negligence based on a violation of a safety statute. NSP also requested a new trial in the interest of justice, on the grounds that the Haldersons' attorney had failed to disclose during voir dire that he had previously hired Donald Woychik, an uncle of juror James Woychik, as an expert witness in a different stray voltage case.
¶ 14 The circuit court granted NSP's motion for a directed verdict on the Haldersons' treble damages claim, concluding the evidence at trial was "insufficient to establish or allow a reasonable jury to find a wanton and willful disregard of the [Haldersons'] rights." The court affirmed the jury's verdict in all other respects, concluding, as relevant here, that the evidence "was sufficient to support the [jury's] finding of negligence." The court denied NSP's requests for a new trial. The Haldersons now appeal, and NSP cross-appeals. Additional facts are included below.
DISCUSSION
I. The Haldersons' appeal
¶ 15 In their appeal, the Haldersons argue the circuit court erred by granting NSP's motion for a directed verdict on their treble damages claim. "A motion for a directed verdict challenges the sufficiency of the evidence." Legue v. City of Racine , 2014 WI 92, ¶ 137, 357 Wis. 2d 250, 849 N.W.2d 837. A court may grant a motion for a directed verdict if it is "satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." WIS. STAT. § 805.14(1). "When there is any credible evidence to support a jury's verdict, even though it is contradicted and the contradictory evidence appears stronger and more convincing, nevertheless the verdict must stand." Legue , 357 Wis. 2d 250, ¶ 137.
¶ 16 A circuit court is "better positioned to decide the weight and relevancy of the testimony" presented at trial than an appellate court. Weiss v. United Fire & Cas. Co. , 197 Wis. 2d 365, 388-89, 541 N.W.2d 753 (1995). Accordingly, on appeal from a circuit court's decision to grant a directed verdict, we must "give substantial deference to the [circuit] court's better ability to assess the evidence." Id. at 389 (quoting James v. Heintz , 165 Wis. 2d 572, 577, 478 N.W.2d 31 (Ct. App. 1991) ). Thus, we will not overturn a circuit court's decision granting a motion for a directed verdict unless the court was "clearly wrong." Id. A court is "clearly wrong" when it overturns a verdict that is supported by any credible evidence. Id.
¶ 17 The issue presented by the Haldersons' appeal is therefore whether the circuit court was "clearly wrong" when it determined there was no credible evidence to support an award of treble damages. Under WIS. STAT. § 196.03(1), a public utility is required to "furnish reasonably adequate service and facilities" to its customers. WISCONSIN STAT. § 196.64(1) provides for an award of treble damages if a utility "willfully, wantonly or recklessly" fails to fulfill that statutory mandate. The injured party must prove its entitlement to treble damages under § 196.64(1) by clear and convincing evidence. Sec. 196.64(2).
¶ 18 In concluding the Haldersons had failed to prove they were entitled to treble damages, the circuit court relied heavily on our prior decision in Allen v. Wisconsin Public Service Corp. , 2005 WI App 40, 279 Wis. 2d 488, 694 N.W.2d 420. In that case, Allen began experiencing problems with his dairy cattle in 1976 after moving them to a new barn. Id. , ¶ 3. By 1988, he suspected stray voltage was the cause of his problems and asked Wisconsin Public Service Corporation (WPS) to perform a stray voltage investigation. Id. "WPS performed the test but did not discover stray voltage." Id.
¶ 19 Allen's problems persisted until 1997, at which point he contacted Neubauer-the same electrician retained by the Haldersons-to test for stray voltage. See id. , ¶ 5. Neubauer detected stray voltage on Allen's farm and asserted it was attributable to WPS. Id. Thereafter, at Allen's request, WPS again tested Allen's farm for stray voltage, and it again reported that there was no stray voltage problem. Id. Nevertheless, WPS offered to, and subsequently did, install an isolator on Allen's farm. Id. After the isolator failed to solve the problems with Allen's cattle, Allen contacted WPS and showed it Neubauer's readings. Id. WPS responded that "the problems were due to issues on the farm, not stray voltage." Id. Neubauer subsequently installed various devices on Allen's farm in an attempt to combat any stray voltage issues, none of which resulted in long-term improvement. Id. , ¶ 6.
¶ 20 A jury ultimately determined that stray voltage from WPS's distribution system caused harm to Allen's cattle and that WPS was negligent in its distribution of electricity to Allen. Id. , ¶ 7. On appeal, Allen argued the circuit court erred by denying his request for treble damages under WIS. STAT. § 196.64(1). See Allen , 279 Wis. 2d 488, ¶ 25. We disagreed, observing that WPS's conduct "was wanton, willful and in reckless disregard of Allen's rights if it demonstrated an indifference to the consequences of its actions, even though it may not have intended insult or injury." Id. Based on the evidence presented at trial, we concluded a jury "could not have found by clear and convincing evidence that WPS acted with indifference to the consequences of its actions." Id.
¶ 21 In reaching that conclusion, we explained:
WPS attempted to find the stray voltage on Allen's farm, but concluded there was no problem. WPS conducted stray voltage testing on Allen's farm on several occasions, using a variety of tests. In none of these visits did WPS detect current exceeding one milliampere. Despite Allen's arguments that WPS falsified the results of the testing, the record does not support those allegations.
Id. , ¶ 26. We also noted that studies published by the PSC and the United States Department of Agriculture "agree[d] that current below four milliamperes has no adverse affect [sic] on dairy cows," and "[b]oth WPS's and Allen's experts found current measuring less than one milliampere on Allen's farm." Id. , ¶ 27. We concluded WPS "could not be faulted for following plausible science when it concluded there was no problem." Id.
¶ 22 In granting NSP's motion for a directed verdict on treble damages, the circuit court reasoned that, under Allen , "a good-faith failure to find stray voltage will not operate as a basis for treble damages. Where numerous tests were performed, there was a good-faith attempt; there may be negligence, but not willful and wanton disregard for the farmer so as to justify a treble damage award." We agree with the circuit court's analysis. Here, like the utility in Allen , NSP tested for stray voltage on the Haldersons' farm on multiple occasions between 1996 and 2011-at least twice in response to requests made by the Haldersons. Each time, NSP failed to detect stray voltage exceeding the PSC's level of concern.[7] In addition, like the utility in Allen , NSP promptly installed a neutral isolator on the Haldersons' farm when asked to do so, despite its test results showing stray voltage levels below one milliampere.
¶ 23 The Haldersons argue that NSP's testing was deficient in numerous ways; that NSP violated various PSC-mandated procedures when testing for stray voltage; that NSP should have performed additional tests, given the symptoms Paul Halderson reported; and that NSP should have informed the Haldersons of their right to demand the installation of a neutral isolator. These arguments, however, go to whether NSP was negligent in its provision of electricity to the Haldersons. As the circuit court correctly noted, to fulfill the standard of willful, wanton, or reckless conduct required for treble damages under WIS. STAT. § 196.64(1), something more than mere negligence is required.[8]
¶ 24 In summary, the evidence in this case shows that NSP tested for stray voltage at the Haldersons' farm on multiple occasions and promptly installed a neutral isolator when the Haldersons asked it to do so. Like the utility in Allen , there is no evidence that NSP falsified the results of its testing or misrepresented those results to the Haldersons. On this record, one could not reasonably conclude that NSP acted with indifference to the consequences of its actions. See Allen , 279 Wis. 2d 488, ¶ 25. Accordingly, there is no credible evidence to support the jury's finding that NSP's failure to provide adequate service to the Haldersons was willful, wanton, or reckless. The circuit court therefore properly granted NSP's motion for a directed verdict on the Haldersons' treble damages claim.
II. NSP's cross-appeal
A. The Haldersons' negligence claim
¶ 25 In its cross-appeal, NSP first argues the circuit court erred by failing to grant its motion for a directed verdict on the Haldersons' negligence claim. As noted above, a circuit court may grant a motion for a directed verdict only if it is satisfied that there is no credible evidence to sustain the jury's verdict. WIS. STAT. § 805.14(1). Here, ample evidence supported the jury's determination that NSP was negligent in its delivery of electrical service to the Haldersons' farm.[9]
¶ 26 For instance, the Haldersons presented evidence at trial that, in Docket 106, the PSC specified five tests that "should be basic to any stray voltage investigation seeking to find the source of a stray voltage problem." O'Neil conceded at trial that he did not perform any of those tests at the Haldersons' farm before 2011.
¶ 27 In addition, the PSC stated in Docket 106:
By describing these basic screening measurement tests, the Commission is not saying that further investigation is not warranted if the basic tests do not indicate a problem. There is no substitute for good judgment based upon an observation of the actual behavior of the animals and the consideration of other variables, including nonelectrical factors. The Commission expects that additional efforts beyond the basic screening tests will be pursued when those observations justify further action.
As early as 1996, O'Neil was aware that the Haldersons' cattle were experiencing symptoms including nervousness, uneven milkout, longer milking time, reluctance to enter the barn/parlor, and heightened somatic cell counts. Despite being aware of these symptoms, O'Neil failed to perform additional testing when his initial tests failed to reveal the presence of stray voltage exceeding the PSC's level of concern.
¶ 28 The Haldersons also presented evidence that NSP violated its own stray voltage policy, which provided that, if NSP measured "1.0 volts or greater" at the barn neutral, NSP would "either correct the situation or install a neutral isolator, temporarily." O'Neil conceded at trial that he obtained two readings at the barn neutral on the Haldersons' farm in 1996 that exceeded one volt. He did not, however, correct the situation or install a neutral isolator.
¶ 29 The Haldersons also introduced evidence at trial indicating that NSP improperly performed its stray voltage investigations in 2005, 2006, 2009, and 2011. For instance, Docket 106 defines cow contact areas as places where a cow can simultaneously touch two points of different voltage. The Haldersons introduced evidence that O'Neil took at least one cow contact measurement at a location no cows could touch. Docket 106 also states that "[c]are should be taken not to take measurements where the points to be measured are bonded together by some means." Evidence at trial demonstrated that some of O'Neil's cow contact measurements did not comply with that requirement.
¶ 30 Evidence was also introduced at trial that NSP had installed two electrical services on a single barn at the Haldersons' farm. Neubauer testified that installing two services on a single structure is improper because it can create a "circulating current," which can result in the presence of stray voltage in cow contact areas.
¶ 31 Other evidence at trial showed that utilities have been required since 1996 to provide neutral isolation to farmers upon request, even if the stray voltage on a particular farm does not exceed the PSC's level of concern. NSP's own expert witness, Mark Cook, a former stray voltage investigator for the PSC, conceded that if he were a dairy farmer, he would request isolation to protect his cows, even if cow contact measurements on his farm did not exceed the level of concern. Despite knowing that the Haldersons' cattle were experiencing symptoms consistent with those caused by stray voltage, O'Neil never suggested that the Haldersons request isolation or informed them that they had a right to do so.
¶ 32 Finally, ample evidence was introduced at trial that, during the period between 1996 and 2011, the Haldersons' cattle exhibited symptoms including nervousness, uneven milkout, longer milking time, reluctance to enter the barn/parlor, heightened somatic cell counts, mastitis, decreased milk production, licking or lapping at water, hoof problems, and increased cull rates. Based on these symptoms, veterinarian Theresa Peterson testified at trial that the Haldersons' cattle were suffering from the effects of stray voltage. Evidence also showed that, after an isolator was installed on the Haldersons' farm in January 2011, their cows' health and milk production improved significantly. This evidence, along with the evidence summarized above and ample additional evidence in the record, was sufficient to support the jury's conclusion that NSP was negligent in its provision of electrical service to the Haldersons' farm.
¶ 33 NSP argues the circuit court should have granted its motion for a directed verdict on the Haldersons' negligence claim because the "only" evidence the Haldersons presented in support of that claim "depended upon testing procedures that deviated from PSC mandates." Essentially, NSP argues that, because Neubauer's testing deviated in some respects from the procedures mandated by the PSC, his results-which indicated the presence of stray voltage exceeding the PSC's level of concern-were not credible evidence of NSP's negligence.
¶ 34 We reject NSP's argument for three reasons. First, the evidence cited above-which does not rely on Neubauer's testing-was sufficient to support the jury's verdict on the negligence claim. A utility can be liable to a customer for common law negligence in a stray voltage case even "if there are no cow contact measurements of more than one milliampere." Hoffman v. Wisconsin Elec. Power Co. , 2003 WI 64, ¶ 14, 262 Wis. 2d 264, 664 N.W.2d 55. Neubauer's testimony that he detected levels of stray voltage exceeding the PSC's level of concern was therefore not necessary for the jury to find NSP negligent.
¶ 35 Second, although cloaked in the guise of a sufficiency-of-the-evidence challenge, the true thrust of NSP's argument appears to be that Neubauer's test results were unreliable because he did not comply with the PSC's testing protocols. However, prior to trial, NSP moved to exclude Neubauer's testimony on this basis, pursuant to WIS. STAT. § 907.02 and Daubert v. Merrell Dow Pharmaceuticals, Inc. , 509 U.S. 579 (1993). The circuit court rejected NSP's argument and permitted Neubauer to testify.
¶ 36 On appeal, NSP does not argue the circuit court erroneously exercised its discretion by admitting Neubauer's testimony. It therefore implicitly concedes that his testimony was properly before the jury. NSP was free to-and did-attempt to discredit Neubauer's testimony at trial by pointing out the ways in which his testing deviated from the PSC-approved procedures. However, it was ultimately up to the jury to decide whether to accept Neubauer's opinions. See Brogan v. Industrial Cas. Ins. Co. , 132 Wis. 2d 229, 239, 392 N.W.2d 439 (Ct. App. 1986) ("When the parties offer conflicting testimony by qualified experts, the issue becomes one of weight of the testimony and credibility of the witnesses, which is within the province of the jury.").
¶ 37 Third, NSP argues that, when the PSC "prescribes stray-electricity testing protocols, evidence obtained in violation of those requirements cannot establish negligence," as a matter of law. We disagree. The statute NSP relies on- WIS. STAT. § 196.857(1g)(b) -provides that the PSC "shall identify standardized test procedures[,] check lists and equipment to be used by public utilities to investigate stray voltage." (Emphasis added.) This language does not prohibit entities other than public utilities from using different procedures. Moreover, it does not expressly prohibit public utilities from using additional tests, beyond those identified by the PSC, to determine whether stray voltage is present. In fact, as noted above, Docket 106 expressly states that a utility should pursue "additional efforts beyond the basic screening tests" when animal behaviors or other variables "justify further action." We therefore reject NSP's argument that testing that does not comply with PSC mandates cannot, as a matter of law, constitute evidence of a utility's negligence.
¶ 38 For all the foregoing reasons, we conclude ample evidence supported the jury's finding that NSP was negligent in its provision of electrical services to the Haldersons. The circuit court therefore properly denied NSP's motion for a directed verdict on the Haldersons' negligence claim.
B. Jury instruction on finding negligence based on a violation of a safety statute
¶ 39 NSP argues, in the alternative, that it is entitled to a new trial because the circuit court improperly instructed the jury on finding negligence based on a violation of a safety statute. After instructing the jury on common law negligence, the court gave a modified version of WIS JI- CIVIL 1009 (2010) ("Negligence: Violation of Safety Statute"), which provided:
Violation of a safety statute or regulation is also negligence, as the term is used in the verdict questions and my instructions.
Plaintiffs claim that [NSP] violated safety statutes and regulations that provide: Every utility shall furnish reasonably adequate services and facilities. A utility must construct, operate, and maintain the wires and any related equipment in a manner which is reasonably adequate and safe. Providing a system that does not cause stray voltage problems to a customer is to be considered basic service, not special needs. If the utility's system is causing stray voltage in a cow contact area to be greater than one milliampere, it is not providing adequate service to that customer.
If you determine that [NSP] violated any of these safety statutes or regulations, the violation is presumed to be negligent unless [NSP] convinces you that it acted as a reasonably prudent utility would have acted under all the surrounding circumstances shown by the evidence in this case.
¶ 40 On appeal, NSP argues that the circuit court erred by giving this instruction for three reasons. However, we agree with the circuit court that NSP has forfeited each of these arguments. WISCONSIN STAT. § 805.13(3) provides that, "[a]t the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury." Either before or during that conference, counsel "may file written motions that the court instruct the jury on the law ... as set forth in the motions." Id. The court "shall inform counsel on the record of its proposed action on the motions and of the instructions ... it proposes to submit." Id. Counsel may object to the proposed instructions, "stating the grounds for objection with particularity on the record." Id. "Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict."[10] Id.
¶ 41 Here, the circuit court held an off-the-record conference regarding jury instructions on the afternoon of Friday, July 28, 2017. NSP contends the parties debated the appropriateness of the Haldersons' proposed safety statute instruction during that conference. On Sunday, July 30, NSP submitted a written objection to the safety statute instruction, which stated:
For the reasons stated during the conference in chambers, this instruction is not appropriate as there was no evidence adduced at trial regarding what safety statutes plaintiffs accused NSP of violating. And NSP specifically opposes the proposed instruction prepared by plaintiffs that cherry picks seemingly favorable language from the Dockets. To the extent the Court is inclined to allow such an instruction, NSP would insist that the instruction be broadly stated to clarify the applicable safety "statute" at issue: Public Service Commission of Wisconsin's Dockets 106 and 115.
¶ 42 The circuit court held a second off-the-record conference regarding jury instructions on the morning of Monday, July 31. During that conference, the court distributed draft jury instructions, which included the Haldersons' proposed safety statute instruction, and invited further discussion regarding those instructions. Revisions were made to the draft jury instructions based on objections the parties raised during the off-the-record conference. Thereafter, the circuit court held an on-the-record conference, during which the parties were given the opportunity to state any objections to the modified instructions and suggest additional language. The court specifically asked NSP's attorney during that conference whether he had any objections to the jury instructions that he wanted to put on the record. Counsel responded:
Your Honor, the only objections were really the issue with respect to treble damages and those issues. We thought that should have been dismissed. There's been no showing of willful and wanton. They may disagree whether they think he did enough tests. We certainly had Mark Cook from PSC say he complied with the PSC.
But, otherwise, to the extent you give it, that's what the instruction is. That's the only instruction issue.
¶ 43 As previously noted, NSP raises three objections to the safety statute instruction on appeal. However, as the above summary demonstrates, there is no evidence in the appellate record that NSP raised either its first objection-i.e., that the instruction "transform[ed] PSC Dockets into safety statutes, despite the absence of legislative intent"-or its third objection-i.e., that the instruction failed to accurately reflect PSC docket mandates-at any time before the circuit court instructed the jury. NSP has therefore failed to preserve those objections for appeal. See WIS. STAT. § 805.13(3) (failure to object at the instruction conference constitutes a waiver of any error in the proposed instructions); see also Wingad v. John Deere & Co. , 187 Wis. 2d 441, 455, 523 N.W.2d 274 (Ct. App. 1994) (explaining that, where the basis for an objection to a jury instruction on appeal is not the same as at trial, the objection is not preserved for appellate review).
¶ 44 NSP has also forfeited its second objection to the safety statute instruction-i.e., that the instruction "cherry-pick[ed]" provisions from the PSC dockets that were favorable to the Haldersons. Although NSP raised that argument in its written objection to the Haldersons' proposed instruction, it did not identify which specific "favorable language" in the instruction it found objectionable, nor did it propose the inclusion of alternative language. Grounds for an objection to a proposed jury instruction must be stated "with particularity," see WIS. STAT. § 805.13(3), and we question whether NSP's written objection complied with that requirement.
¶ 45 More importantly, however, we observe that after NSP submitted its written objection, the parties and the circuit court discussed the jury instructions during an off-the-record conference on the morning of July 31, 2017. Thereafter, the court specifically invited NSP's counsel to memorialize any objections to the proposed jury instructions on the record. Counsel responded that his only objection was to the inclusion of an instruction on treble damages. In a prior case involving multiple jury instruction conferences, our supreme court interpreted WIS. STAT. § 805.13(3)"to require counsel to make his [or her] objections at th[e] 'last' conference on instructions." Air Wis., Inc. v. North Cent. Airlines, Inc. , 98 Wis. 2d 301, 314, 296 N.W.2d 749 (1980). NSP did not do so, and it has therefore forfeited its second objection to the safety statute instruction.
¶ 46 NSP argues that, even if we conclude it forfeited its arguments regarding the safety statute instruction, we should nevertheless order a new trial based on that instruction, pursuant to either the plain error doctrine or our power of discretionary reversal under WIS. STAT. § 752.35. The plain error doctrine "allows appellate courts to review errors that were otherwise forfeited by a party's failure to object." State v. Miller , 2012 WI App 68, ¶ 18, 341 Wis. 2d 737, 816 N.W.2d 331. However, we use the plain error doctrine sparingly, and only to address errors that are "obvious and substantial." Id. Section 752.35, in turn, permits us to reverse despite a party's forfeiture where "the real controversy has not been fully tried" or where "it is probable that justice has for any reason miscarried." We exercise our discretionary reversal power under § 752.35"sparingly and only in the most exceptional cases." State v. Schutte , 2006 WI App 135, ¶ 62, 295 Wis. 2d 256, 720 N.W.2d 469.
¶ 47 We conclude this is not the sort of "exceptional case" warranting discretionary reversal under WIS. STAT. § 752.35, nor was the alleged error so "obvious and substantial" as to permit application of the plain error doctrine. Notably, while NSP raises three objections to the safety statute instruction on appeal, it did not raise two of those objections at any point before the circuit court instructed the jury. If the alleged deficiencies in the instruction were so obvious and substantial, we question why NSP failed to raise them sooner. Moreover, as summarized above, there was ample evidence from which the jury could find common law negligence on the part of NSP, regardless of whether its conduct also violated any safety statute. Under these circumstances, we cannot conclude it is "probable" that the safety statute instruction caused a miscarriage of justice.
C. The Haldersons' attorney's past professional relationship with Donald Woychik
¶ 48 Finally, NSP argues the circuit court should have granted it a new trial in the interest of justice, under WIS. STAT. § 805.15(1), because Bernt Hammarback, one of the Haldersons' attorneys, violated his professional duty of candor by failing to reveal his past professional relationship with Donald Woychik, an uncle of juror James Woychik.[11] Whether to grant a new trial in the interest of justice under § 805.15(1) is "highly discretionary," and we will not reverse unless the circuit court erroneously exercised its discretion. Suhaysik v. Milwaukee Cheese Co. , 132 Wis. 2d 289, 303, 392 N.W.2d 98 (Ct. App. 1986). A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a rational process to reach a reasonable conclusion. Loy v. Bunderson , 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982).
¶ 49 During voir dire, attorney Hammarback questioned the potential jurors regarding their knowledge of stray voltage. One juror, Gerald Bautch, responded, "I knew a couple people used to go around testifying on stray voltage. They were customers of mine." When asked for those individuals' names, Bautch replied, "Donny Woychik. And Dave Stetzer from Blair. Testified on stray voltage. But 25 years ago." In response to the same line of questioning, James stated, "I have talked, like Mr. Bautch said, with my uncle, Donald Woychik, because he's big into the stray voltage. But I'm open-minded about it one way or the other. Got to prove it to me one way or the other."
¶ 50 NSP's counsel did not follow up with James during voir dire about his uncle's involvement with stray voltage. James was ultimately selected to serve on the jury. After jury selection, NSP's stray voltage expert, Mark Cook, identified Donald as a stray voltage expert who worked for plaintiffs and knew the Haldersons' attorneys. On the third day of trial, NSP moved to strike James from the jury on that basis. During a discussion regarding NSP's motion, attorney Hammarback conceded he knew Donald, stating, "I know [sic] Don about 20 years ago. He and I had a case."[12]
¶ 51 On the fifth day of trial, the circuit court and counsel for NSP questioned James outside the presence of the other jurors about his relationship with Donald. James stated he did not see Donald very often, perhaps only "a couple times a year," and the last time they discussed stray voltage was "five to ten years ago." They discussed stray voltage, at most, on two occasions, and James stated nothing about those discussions affected his view of the instant case.
¶ 52 Attorney Hammarback then clarified that he had actually spoken to Donald "about a week ago, and it's the first time I talked to him in about 20 years." The circuit court responded, "I'm not concerned about Don Woychik. I'm concerned about the juror." The court found that James "was candid" and volunteered during voir dire that his uncle "was big into stray voltage." The court further observed that James had indicated he believed he could be impartial, and nothing about the extent or character of his previous conversations with his uncle suggested that he was objectively biased. The court therefore declined NSP's request to remove James from the jury.
¶ 53 Thereafter, on the morning of the sixth day of trial, NSP sought permission to depose Donald, based on the revelation that attorney Hammarback had contacted him one week before trial. The circuit court granted NSP's request. During his subsequent deposition, Donald described James as his "estranged nephew," stating they had little contact and it had been about two years since they last spoke.[13] When asked about his contacts with attorney Hammarback, Donald initially testified they had not spoken in over twenty years. However, when subsequently asked whether attorney Hammarback had contacted him one week before trial, Donald expressed some confusion or uncertainty. Donald then testified attorney Hammarback had contacted him "a year, six months, year and a half ago, when the trial was originally scheduled for this." He testified James' name came up during that conversation, but he could not specifically remember what he and attorney Hammarback discussed.
¶ 54 Attorney Hammarback disputed Donald's account, again telling the circuit court that his only contact with Donald in the past twenty years had been a single phone call one week before the July 2017 trial. Attorney Hammarback asserted he asked Donald about other stray voltage cases in the county during that conversation and about "what [Donald] thought the perception of stray voltage was in the community." He denied telling Donald that James was a potential juror.
¶ 55 The circuit court ultimately granted NSP's request to remove James from the jury. The court accepted as credible James' subjective assertion that he was able to be impartial, as well as his assertion that he had not recently communicated with his uncle. The court also stated there was "nothing wrong" with attorney Hammarback calling Donald prior to trial and asking "what do you think about your nephew, would he be a decent juror," because that type of communication was "a part of jury research." The court further stated, on two occasions, that it had no reason to question attorney Hammarback's version of events. However, given the "lack of an adequate explanation from Donald Woychik" regarding his communications with attorney Hammarback, the court nevertheless decided to remove James based on the "potential appearance of bias."
¶ 56 As noted above, NSP ultimately moved for a new trial in the interest of justice based on attorney Hammarback's conduct. In its oral ruling denying that motion, the circuit court observed it could not conclude that James would have been biased had he sat on the jury, or that James "knew anything of the communication between Mr. Hammarback and [Donald]." The court explained, in essence, that it had granted NSP's request to remove James from the jury out of an abundance of caution, based on Donald's "less than candid demeanor" during his deposition. The court further explained:
The exclusion was structured in a way that it would appear to Juror Woychik and the other jurors that he was simply one of three alternates excused in ordinary course. Both parties agreed to the manner in which that was done. The court is satisfied that there was no impact on the 12 jurors who decided the case. They were told not to discuss the case prior to deliberation, even amongst themselves. They reiterated many times during the course of the trial that they had not done so and NSP [has] produced no evidence suggesting otherwise.
The remedy that had been requested by NSP was granted, that being exclusion of Mr. Woychik, and NSP has no grounds now to ask for a new trial on the ground that the court didn't go further than was requested.
¶ 57 We conclude the circuit court did not erroneously exercise its discretion by denying NSP's motion for a new trial based on attorney Hammarback's past relationship (and more recent contact) with Donald. While NSP now asserts it is entitled to a new trial on that basis, it never moved for a mistrial based on attorney Hammarback's conduct.[14] "The law in Wisconsin is quite clear that it is necessary to make immediate objection and move for a mistrial if the issue is misconduct of counsel." Nimmer v. Purtell , 69 Wis. 2d 21, 40, 230 N.W.2d 258 (1975). "[T]he failure to move for a mistrial is generally considered an election to take one's chances on a favorable verdict and a waiver of any right to assert prejudice at a later time." Dostal v. Millers Nat'l Ins. Co. , 137 Wis. 2d 242, 259, 404 N.W.2d 90 (Ct. App. 1987).
¶ 58 Here, as the circuit court correctly observed, NSP received exactly what it asked for during trial-the removal of James from the jury. Having failed to move for a mistrial, NSP forfeited its right to later argue that attorney Hammarback's conduct so prejudiced NSP as to necessitate a new trial. Under these circumstances, the circuit court did not err by denying NSP's postverdict request for a new trial in the interest of justice based on attorney Hammarback's conduct.
¶ 59 NSP argues a new trial is necessary because "the full extent of prejudice from James' association with the other jurors can never be known." However, the circuit court emphasized that it had no reason to doubt James' assertions that he could be impartial, that he had not had any recent contact with Donald, and that he was unaware attorney Hammarback had contacted Donald before trial. Moreover, the court correctly noted that the jurors were repeatedly told during trial "not to discuss the case prior to deliberation, even amongst themselves." The jurors were also repeatedly asked during trial whether they had violated that restriction, and each time they responded in the negative. We presume that jurors follow the court's instructions, see State v. Truax , 151 Wis. 2d 354, 362, 444 N.W.2d 432 (Ct. App. 1989), and NSP has provided no evidence to suggest that the jurors in this case did not do so. NSP's complete failure to establish any prejudice resulting from attorney Hammarback's conduct further convinces us that the court did not err by denying NSP's request for a new trial.
By the Court. -Judgment affirmed.
Not recommended for publication in the official reports.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

According to Docket 106, a milliampere is a "measurement unit of current flow." The PSC decided to state the "level of concern" for stray voltage in milliamperes, rather than volts, because "it is actually the current flowing through the animal that affects [the animal]."

Docket 106 explained that a "cow contact" area is an area "where the animal can simultaneously access two points of different voltage of sufficient magnitude to cause an objectionable current to flow through the animal." Cow contact areas "primarily include the milking, feed and watering areas." Docket 106 states that cow contact areas are the "most important" areas to measure when testing for stray voltage, and "[w]hile measurements from the primary or secondary neutral to a reference ground can be valuable to take, the measurements of main interest should be in those areas where the cow can close a circuit to allow current to flow."

The Haldersons settled their claims against Star Blends prior to trial.

"A somatic cell count is equivalent to the white blood cell count in humans. As the level of inflammation or infection goes up, there is an increase in the somatic cell count." James v. Beauregard Elec. Co-op., Inc. , 736 So. 2d 353, 355 (La. Ct. App. 1999). Paul Halderson told O'Neil in 1996 that the somatic cell count for his cows' milk had increased from 350,000 to 820,000, which Paul Halderson testified at trial was "bordering on unsalable milk."

Paul Halderson clarified that, following installation of the isolator in January 2011, his cattle's health improved until June 2011. However, he testified their health again declined in June 2011 after they ingested bad feed delivered by Star Blends. As noted above, the Haldersons settled with Star Blends before trial. At trial, the Haldersons clarified that they were not making any claim against NSP for damages to their herd that occurred after the delivery of bad feed in June 2011.

The Haldersons argue O'Neil "conceded" during his deposition that his 1996 testing revealed "cow contact currents well above 1 [milliampere]." Specifically, they assert O'Neil conceded at deposition that a graph produced during the 1996 testing showed a blue line, which represented a "cow-contact location," at approximately two volts. They contend that reading shows that the cow-contact line was "well above the 1 [milliampere] level of concern." They therefore assert there was evidence before the jury demonstrating that NSP was aware of stray voltage exceeding the level of concern in 1996.
During his trial testimony, however, O'Neil explained that he had a difficult time identifying the various lines on the 1996 graph during his deposition. He clarified that he had misidentified the cow-contact line during his deposition, and that line could actually be seen on the graph just above zero. He testified the line he had previously identified as the cow-contact line during his deposition was actually the line for NSP's primary neutral. He further testified that he filed an errata sheet after his deposition clarifying his testimony on this point.
When reviewing a circuit court's decision to grant a motion for a directed verdict, we must defer to the circuit court's superior ability to assess the evidence. See Weiss v. United Fire & Cas. Co. , 197 Wis. 2d 365, 388-89, 541 N.W.2d 753 (1995). Moreover, we are mindful of the fact that the Haldersons were required to prove their entitlement to treble damages by clear and convincing evidence. See Wis. Stat. § 196.64(2). Under these circumstances, we conclude O'Neil's deposition testimony regarding the 1996 graph, which he later clarified at trial, does not constitute credible evidence that NSP detected stray voltage exceeding the PSC's level of concern in 1996. In addition, based on our review of the record, it does not appear the Haldersons cited O'Neil's deposition testimony regarding the 1996 graph in the circuit court when responding to NSP's motion for a directed verdict on treble damages. "Arguments raised for the first time on appeal are generally deemed forfeited." Tatera v. FMC Corp. , 2010 WI 90, ¶ 19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810.

The Haldersons argue the circuit court applied an incorrect legal standard by requiring a "deceitful" state of mind in order to support a treble damages award. However, our review of the hearing transcript demonstrates the circuit court required no such thing. Instead, the court stated that, while the "failure to identify stray voltage may constitute negligence," without a "culpable state of mind" it does not "give rise in and of itself to a wanton and willful finding necessary to sustain the treble damages award." This statement merely shows the circuit court correctly recognized that something more than negligence is required to support an award of treble damages under Wis. Stat. § 196.64(1). Contrary to the Haldersons' assertion, the court did not require them to prove "deceit" on NSP's part. Although the court listed "falsification of documents" and "misrepresentation of readings" as examples of the type of conduct that could give rise to treble damages, the court did not state that those particular actions were required in order to support a treble damages award.

The evidence presented at trial regarding NSP's negligence was voluminous. We do not attempt to summarize that evidence in its entirety. Instead, we merely give examples of testimony and other evidence that supported the jury's negligence verdict.

Although Wis. Stat. § 805.13(3) uses the term "waiver," our supreme court has clarified that "forfeiture" is the proper term for the concept described in the statute. See Best Price Plumbing, Inc. v. Erie Ins. Exch. , 2012 WI 44, ¶ 37 n.11, 340 Wis. 2d 307, 814 N.W.2d 419.

For ease of reading, we refer to James and Donald Woychik by their first names throughout the remainder of this opinion.

Another of the Haldersons' attorneys similarly stated he had a case with Donald "about 25 years ago." However, NSP does not raise any argument on appeal that it is entitled to a new trial in the interest of justice based on that second attorney's past relationship with Donald. We therefore limit our discussion to attorney Hammarback.

The circuit court attended Donald's deposition and conducted some of the questioning.

Nor did NSP request a curative jury instruction regarding any potential influence James may have had on the other jurors.